J. ALDER ELLIS *et al.*

*v.*

SAMUEL D. WARD *et al.*

*Filed at Ottawa October 31, 1890.*

1. CORPORATIONS—*salary paid president without contract—liability of president and directors.* If the directors of an incorporated company apply the funds of the corporation to the discharge of their own indebtedness, or wrongfully to pay an outgoing president a salary for past services not agreed to be paid until after their performance, they will be liable to the creditors of the company for the amount of the funds thus misapplied.

2. Where a president of an incorporated company performs services as such, without any by-law or resolution providing compensation for his services, and afterwards accepts a salary voted to him for past services, he will be liable to refund the same in favor of creditors of the company.

3. SAME—*compensation to officers—when allowable.* The law will not imply a promise on the part of a private corporation to pay its officers for the performance of their usual duties. In order that such officers may legally demand and recover for such services, or the corporation legally make allowance and payment therefor, it must appear that a by-law or resolution has been adopted authorizing and fixing such allowance before the services are rendered.

4. SAME—*assets, a trust fund.* In equity the assets of a corporation are a trust fund, and the directors are trustees, and have no power or right to use or appropriate the funds of the corporation to themselves, or to waste, destroy, give away or misapply them.

5. STATUTE OF LIMITATIONS—*between corporation and directors.* No lapse of time is a bar to a direct or express trust, as between the trustee and *cestui que trust.* The relation between a corporation and its directors being that of a direct trust, as contradistinguished from an implied one, the Statute of Limitations presents no bar to a bill by a receiver of the corporation to hold the directors liable for misappropriation of the corporate assets or funds.

APPEAL from the Appellate Court for the First District;— heard in that court on appeal from the Circuit Court of Cook county; the Hon. JOHN C. BAGBY, Judge, presiding.

510 Ellis *et al. v.* Ward *et al.*

Mr. William A. Montgomery, for the appellant Ellis and others:

The claim is barred by the Statute of Limitations, unless a fraudulent concealment has taken the case out of the statute. The facts show that the means of knowledge were always so close at hand for the corporation that it was the same thing as actual knowledge. *Wood* v. *Carpenter*, 101 U. S. 135; *Bank* v. *Carpenter*, id. 567; *Walker* v. *Soule*, 138 Mass. 570; *Cole* v. *McGlathry*, 9 Greenlf. 131; *McKown* v. *Whitmore*, 31 Mo. 449.

Appellants, if trustees at all, were merely so by construction of law, and constructive trusts are subject to the Statute of Limitations. Wood on Limitation of Actions, sec. 58, and notes, sec. 200; *Robinson* v. *Hook*, 4 Mason, 139; *Farnum* v. *Brooks*, 9 Pick. 212; Angell on Limitations, secs. 25, 178, 187; *Kane* v. *Bloodgood*, 9 Johns. Ch. 90; *Walker* v. *Walker*, 16 S. & R. 376; *Hawley* v. *Cramer*, 4 Cow. 717.

The statute having commenced to run, is never suspended, unless for some of the reasons mentioned in its saving clause. Wood on Limitation of Actions, sec. 6, and notes; *People* v. *White*, 11 Ill. 350; *Supervisors* v. *Gordon*, 82 id. 437; *Hogan* v. *Kurtz*, 4 Otto, 773; Angell on Limitations, secs. 477, 479.

If the receiver was entitled to relief at all, the decree should have been against John V. Farwell alone, or at least he should have been included in the decree.

Messrs. Peckham & Brown, for the appellant Nickerson:

In reclaiming misappropriated trust money, equity will resort primarily to him who has wrongfully received it. *Baynard* v. *Wooley*, 20 Beav. 583; *Goldsborough* v. *Darst*, 9 Bradw. 205.

Facts were stated and commented on showing that Farwell is the party liable.

Messrs. HUTCHINSON & LUFF, for the appellee Ward:

The payment of the $23,208.33 was illegal, whether paid as and for a salary to John V. Farwell, or for the stock purchased of Farwell by appellants Ellis, Peet and Nickerson, and Farwell and the appellants should be held liable to refund the amount.

Unless provision is made for compensation for the services of the president of a corporation in the by-laws, or by resolution of the directors or stockholders prior to the rendering of such services, such officer will have no right to compensation for the same. • *Cheeney* v. *Railway Co.* 68 Ill. 570; *Loan Association* v. *Stonemetz*, 39 Pa. 534; *Railroad Co.* v. *Ketchum*, 27 Conn. 170; *Butts* v. *Wood*, 37 N. Y. 317; *Merrick* v. *Peru Coal Co.* 61 Ill. 472.

The Republic Life Insurance Company was insolvent at the time of the payment of the $23,208.33, and the payment was illegal as to the creditors and stockholders, whether it was solvent or insolvent. *Clapp* v. *Peterson*, 104 Ill. 26.

The claim was not barred by the Statute of Limitations, because the appellants were trustees of the corporate property for stockholders and creditors. Farwell was a director. *Melvin* v. *Insurance Co.* 80 Ill. 456; *Holder* v. *Railroad Co.* 71 id. 106; *Gridley* v. *Railroad Co.* id. 200; *Butts* v. *Wood*, 37 N. Y. 317.

The stockholders and creditors had no actual or constructive notice of the payment of the money. *Melvin* v. *Insurance Co.* 80 Ill. 458; *Wood* v. *Dummer*, 3 Mason, 305; *Osgood* v. *Osgood*, 4 Keyes, 70; *Sawyer* v. *Hoag*, 17 Wall. 619.

The suit was brought within five years after Ward's appointment as receiver. The receiver represents both creditors and stockholders of the corporation. The creditors had no right of action until the appointment of a receiver. *Crandale* v. *Lincoln*, 52 Conn. 73; High on Receivers, sec. 314.

The statute does not run unless the trustee assumes the absolute ownership of the property, and it must appear that

the *cestui que trust* had knowledge of the trustee's adverse claim, and that the trustee had been guilty of no fraud. Wood on Limitations, 414, and note; *Kenton* v. *Greenwood,* 8 Ga. 97; *Wood* v. *Dummer,* 3 Mason, 308; *Walden* v. *Karr,* 88 Ill. 49.

The relation between appellants and the stockholders and creditors of the insurance company having been that of trustees and *cestuis que trust,* and there having been a concealment by the trustees when there should have been a full disclosure of the transaction, no diligence was required on the part of the *cestuis que trust* to discover the payment of the money made in fraud of their rights.

Mr. JOHN N. JEWETT, for the appellee Ward, the receiver:

If an officer of a corporation serves in that capacity without any arrangement or provision for compensation, he can not receive any, and if paid, it may be recovered back in the interest of creditors and stockholders. *Holder* v. *Railroad Co.* 71 Ill. 106; *Cheeney* v. *Railroad Co.* 68 id. 570; *Kirkpatrick* v. *Ferry Co.* 49 Pa. St. 121; *Railroad Co.* v. *Ketchum,* 27 Conn. 170; *Henry* v. *Railroad Co.* 27 Vt. 435.

Mr. GEORGE F. WESTOVER, for the appellee Farwell.

Mr. JUSTICE SHOPE delivered the opinion of the Court:

The appeals in this cause bring before this court for review the judgment of the Appellate Court for the First District, affirming the decree of the circuit court of Cook county. By its decree the circuit court granted to the receiver the relief prayed in his bill against certain of the defendants, but dismissed the bill as against the defendant John V. Farwell. From this decree the defendants affected appealed, and as to that part of the decree dismissing the bill as to Farwell, the receiver also appealed. The appeals were heard and considered by two of the justices of the Appellate Court, only, the third member of that court, because of personal interest, de-

clining to sit; and the two sitting justices being divided in opinion, a judgment of affirmance *pro forma* was entered, from which judgment the parties, by their further appeal, bring the record here.

The Statute of Limitations was interposed by all the defendants, and one of the questions presented is, whether the case made is such as that the statute can be availed of. A statement of fact, is therefore rendered necessary.

It appears that on May 25, 1877, the Auditor of Public Accounts, under statutory authority, began proceedings in the circuit court of Cook county to enjoin the Republic Life Insurance Company, a corporation of this State, from further proceeding with its corporate business, in which cause Samuel D. Ward was appointed, and duly qualified, as receiver of the estate of such company. After the receiver took possession of the assets of the company it was developed that the company was insolvent, its liabilities greatly exceeding its assets. Such proceedings were had in the cause, that on June 22, 1881, the company was perpetually enjoined and restrained from further prosecuting its corporate business, and the appointment of the receiver was confirmed.

On the 24th of May, 1882, the receiver exhibited his bill in chancery in the circuit court of Cook county, against John V. Farwell, J. Alder Ellis, Emerson W. Peet, Samuel M. Nickerson, George C. Clark and John M. Butler, seeking discovery and praying a decree for $23,208.33. The facts upon which the alleged liability of the defendants was predicated were substantially these: The Republic Life Insurance Company was organized in 1869, under a special charter. Defendant Farwell became the president of the company in April, 1870, and so continued until June 14, 1876. During this time he held and owned a large number of the shares of the capital stock of the company, and served the company as president, without salary. He did not, it appears, at any time demand compensation from the company for his services as president, nor

did the corporation make any provision for paying or allowing him any salary or compensation for such services.   The Republic Life Insurance Company appears to have acquired and owned the capital stock of another corporation, the National Life Insurance Company, of which corporation defendant Farwell was also president, and this stock was held by Farwell as trustee for the Republic Life Insurance Company.  Farwell neither demanded nor was paid a salary or other compensation for services as president of the National, nor did the company, prior to June 14, 1876, undertake to make him any payment or allowance therefor.

On March 2, 1876, the defendant Farwell owned and held 1420 shares of the capital stock of the Republic.   Prior thereto the defendants Ellis, Peet and Nickerson had sought to purchase the same of Farwell, for the obvious purpose, as it would seem, (other stock in the corporation having been acquired by them,) of thereby securing a controlling interest in that corporation.   Respecting the antecedent negotiations the statements of the parties are conflicting.   On behalf of Ellis and his associates it is said, that Farwell refused to sell his stock in the Republic unless he was paid a salary for his past services as president of the two corporations, and that he did agree to sell his stock in the Republic to Ellis, Peet and Nickerson at twenty-six and one-half cents on the dollar, under the further agreement that when they, Ellis, Peet and Nickerson, should get control of the Republic, (and so of the National,) those companies should vote him a salary,—the Republic of $4500 a year for the time he had acted as president of that company and $5000 a year for the time he had acted as president of both companies, to be divided between the two companies, and aggregating some $30,000,—and that this arrangement was substantially carried out by Ellis, Peet and Nickerson, and those associated with them in the directory of the two companies, and the money paid to and received by Farwell. Farwell, on the other hand, denies this agreement, and while

admitting that he had negotiations with Ellis and Peet for the purchase of his stock in the Republic, and knew that they were buying up the stock of that company for the purpose of acquiring its control, and so the control of the National, insists that such negotiations with him directly were broken off, and that Peet had a conference in Washington City with Charles B. Farwell, a brother of defendant Farwell, and associated with him in business, which resulted in Charles B. Farwell coming to Chicago, and there, as the representative of defendant Farwell, entered into negotiations with Ellis and Peet, which finally culminated in a written agreement dated March 2, 1876. By this agreement Charles B. Farwell agreed to sell and deliver to Ellis, Peet and Nickerson, on or before June 15, 1876, 1420 shares of the full paid capital stock of the Republic Life Insurance Company, standing in the name of John V. Farwell on the books of that company, and to make, or cause to be made, the necessary assignments and transfers to vest the title thereto in the purchasers. Also, to elect, or cause to be elected, as directors of the National Life Insurance Company, for a year from June 14, 1876, John V. Farwell, Charles B. Farwell, F. H. Kales, Anson Stager, Emerson W. Peet, George C. Clark, J. F. Crank, F. D. Gray, J. M. Phelps, A. S. Pratt and George H. Stewart, and after such election to deliver to Ellis, Peet and Nickerson the resignations of John V. Farwell, Charles B. Farwell and J. M. Phelps as directors of said corporation, to take effect at such time as Ellis, Peet and Nickerson might specify. Also, to elect as directors of the National Life Insurance Company, in place of those whose resignations might be accepted, such of the following named persons, namely, Samuel M. Nickerson, J. Alder Ellis, Henry H. Porter and Augustus A. Carpenter, as Ellis, Peet and Nickerson might indicate, and also to elect, or cause to be elected, as directors of the Republic Life Insurance Company, at the annual stockholders' meeting the second Wednesday of June ensuing, a board of directors of the Re-

public acceptable to Ellis, Peet and Nickerson.    And further, that 1372 full paid shares of the capital stock of the Republic, formerly owned by Paul Cornell but then owned and controlled; by the National Life Insurance Company, should be properly. transferred to the National Life Insurance Company, and the same should not be sold or transferred to any one, but remain the property of the National company until the performance of the covenants specified in the agreement.    In consideration thereof, Ellis, Peet and Nickerson agreed, on their part, to pay to Charles B. Farwell $66,000, $37,630 thereof on March 15, 1876, and $28,370 on June 15, 1876.

This agreement, duly executed by the parties therein named, —that is, Charles B. Farwell, (representing, in fact, John V. Farwell,) and Ellis, Peet and Nickerson,—was by Charles B. Farwell handed to Simeon Farwell, financial manager of the firm of J. V. Farwell & Co., with instructions to place the same with the bills receivable of that firm, and when the sums therein mentioned were paid, to credit them to the defendant John V. Farwell.    Charles B. Farwell, who, in the making of this agreement, admittedly acted for his brother, denies that he made any other agreement with Ellis, Peet and Nickerson except that expressed in the written agreement aforesaid.    On March 15, 1876, and in accordance with this written agreement, Ellis paid to Simeon Farwell the first installment thereon, ($37,360,) by the personal check of Nickerson, and an endorsement of this payment was, by Simeon Farwell, made upon the back of the agreement, and the same was passed to the credit of defendant Farwell, on the books of the firm of J. V. Farwell & Co.

It further appears, that on the 11th day of April, 1876, John V. Farwell entered into a written agreement with Ellis, Peet and Nickerson, by the terms of which, (after reciting that C. B. Farwell had, on March 2, 1876, made an agreement with Ellis, Peet and Nickerson, relating to the stock of the Republic company standing in the name of John V. Farwell,

and that to complete that agreement J. V. Farwell was about to resign his trusts of and concerning 9760 shares of the capital stock of the National company held by him as trustee,) it was mutually agreed that such stock should remain and be held upon such trusts as then lawfully existed in regard thereto, until changed by competent parties, and that Ellis, Peet and Nickerson should faithfully apply the assets and property of said companies to pay for and discharge the policies and other liabilities of such companies.

The annual meeting of stockholders was held June 14, 1876, and John V. Farwell, Charles B. Farwell, F. H. Kales, Samuel M. Nickerson, Emerson W. Peet, J. Alder Ellis, H. H. Porter, A. A. Carpenter, George C. Clark, John M. Butler, Charles G. Smith, A. S. Pratt, Charles H. Antes, James B. Goodman, M. S. Dickerson, H. S. Vail, M. C. Lightner and Samuel D. Ward were elected directors of the Republic company, and on the same day the new board of directors met and elected J. Alder Ellis president, John M. Butler vice-president and treasurer, and Emerson W. Peet secretary, and at the same meeting the following named directors were appointed a finance committee, namely, Samuel M. Nickerson, J. Alder Ellis, John M. Butler, E. W. Peet and George C. Clark. The fact appears to be unquestioned, that after the stockholders' and directors' meetings so held, the result of which was the practical carrying out of the agreement of March 2, 1876, as respects the directory of this corporation, John V. Farwell and C. B. Farwell delivered to Ellis, Peet and Nickerson their resignations as directors.

It further appears that later in the day, spoken of by some of the witnesses as in the evening of June 14, 1876, the finance committee so appointed held a meeting, attended by all the members of that committee, when a resolution was passed authorizing the officers of the Republic company to pay John V. Farwell $23,208.33 as full compensation for his services as president of that corporation, and that he be paid $5208.33

as full compensation for his services as president of the National company. But there is no pretense that Farwell was present at such committee meeting, or had any personal knowledge of the committee's action. It is said, however, by Ellis and Peet, that the action of the committee was in accordance with the verbal arrangement entered into between John V. Farwell and Ellis, Peet and Nickerson, before the making of the written agreement of March 2, 1876, and to that extent formed the consideration for the sale and transfer of Farwell's stock to Ellis, Peet and Nickerson, and it appears from the testimony of Ellis that he consulted Charles Hitchcock, a prominent member of the bar, since deceased, and was advised that such payments could lawfully be made. But that any such verbal arrangement existed or was ever entered into is explicitly denied by John V. Farwell, he insisting that he never, at any time, agreed to sell his stock for less than the sum expressed in the agreement of March 2, 1876, ($66,000,) and that he never demanded or received any sum whatever as salary or compensation for services rendered as president of either corporation.

As affecting the liability of the appellants Ellis, Peet and Nickerson, this contention is unimportant. If the funds of the company were by them applied to the discharge of their individual indebtedness to Farwell, under the contract of March 2, 1876, there could be no question of their liability to the company, or its representative, the receiver, for the amount thus misappropriated by them. So, also, if, after obtaining control of the corporation, they wrongfully and illegally paid out the funds of the company to Farwell for past services, in violation of their duty, they would be likewise liable.

The doctrine is well settled in this court, that the law will not imply a promise on the part of a private corporation to pay its officers for the performance of their usual duties. In order that such officers may legally demand and recover for such services, or the corporation legally make allowance and

payment therefor, it must appear that a by-law or resolution had been adopted authorizing and fixing such allowance before the services were rendered. *American Central Ry. Co.* v. *Miles,* 52 Ill. 174; *Mérrick* v. *Peru Coal Co.* 61 id. 472; *Rockford, Rock Island and St. Louis Railroad Co.* v. *Sage,* 65 id. 328; *Cheeney* v. *LaFayette, Bloomington and Mississippi Ry. Co.* 68 id. 570; 87 id. 446; *Holder* v. *La Fayette, Bloomington and Mississippi Ry. Co.* 71 id. 106; *Gridley* v. *La Fayette, Bloomington and Mississippi Ry. Co.* 71 id. 200; *Illinois Linen Co.* v. *Hough,* 91 id. 63. The rule is analogous to that governing trustees generally, who, at common law, were not entitled to compensation, except as there was warrant therefor in the contract or statute under which they acted.

It is not pretended that either by by-law or resolution the Republic Life Insurance Company fixed any compensation to be paid its president for the performance by him of the duties of that office, before or during the time John V. Farwell held that office, and after he ceased to hold such office it was not competent for that corporation to vote and pay him for his past services. Such appropriation and expenditure of the money of the corporation by its then acting directors being unauthorized and illegal, might be repudiated by the corporation, or its representative, the receiver, and the sums so wrongfully and illegally expended recovered back. That the acting directors of this corporation caused to be withdrawn from its treasury and paid to John V. Farwell the sum of $23,208.33, is undeniable. That this was done by and through the active instrumentality of appellants Ellis, Peet and Nickerson, is also undeniable. That the finance committee appointed by the board of directors, of which these three persons were members and present and acting, authorized such payment, for account of past services as president, by formal resolution, is also undeniable; and if this record shows that this was done with the knowledge, concurrence and assent of John V. Farwell, and that he took this money as and for salary for services as

president of this corporation prior to the passage of such reso-
lution, his liability, also, to the receiver of such corporation in
this cause therefor, can not be questioned.

Following the elections of June 14, 1876, the control and
management of the Republic and National Life Insurance
Companies passed into the hands of Ellis, Peet and Nickerson
and their associates, and, apparently, their first official act
after assuming such control was to pass a resolution the effect
of which was to withdraw from the coffers of those corpora-
tions, $23,208.33 from the Republic and $5208.33 from the
National, of funds held by them in their trust capacity, as
directors and officers of such corporations, and apply the same
towards the payment for the Farwell stocks, for their personal
account and benefit, or in payment of such illegal salary.

It is a principle of general application, and recognized by
this court, that the assets of a corporation are, in equity, a trust
fund, (*St. Louis and Sandoval Coal and Mining Co.* v. *Sando-
val Coal and Mining Co.* 116 Ill. 170,) and that the directors
of a corporation are trustees, and have no power or right to
use or appropriate the funds of the corporation, their *cestui
que trust*, to themselves, or to waste, destroy, give away or
misapply them. (*Holder* v. *La Fayette, Bloomington and Mis-
sissippi Ry. Co.* 71 Ill. 106; *Cheeney* v. *La Fayette, Blooming-
ton and Mississippi Ry. Co.* 68 id. 570; 1 Morawetz on Private
Corp. secs. 516, 517.) And it is equally well settled, that no
lapse of time is a bar to a direct or express trust, as between
the trustee and *cestui que trust.* (*Chicago and Eastern Illinois
Railroad Co.* v. *Hay,* 119 Ill. 493; Wood on Limitation of
Actions, sec. 200, and cases cited in note.) If the trust as-
sumed by the directors of a corporation in respect of the cor-
porate property under their control is to be regarded as a
direct trust, as contradistinguished from simply an implied
trust, then it is apparent, under the rule announced, the stat-
ute presents no bar to this proceeding by the receiver of the
corporation. Ordinarily, an express trust is created by a deed

or will; but there are many fiduciary relations established by law, and regulated by settled legal rules and principles, where all the elements of an express trust exist and to which the same legal principles are applicable,—and such appears to be the relation established by law between directors and the corporation. 2 Pomeroy's Eq. sec. 6; id. secs. 1088-1090, 1094. And see, also, as respects stockholders, *Hightower* v. *Thornton*, 8 Ga. 486; *Payne* v. *Bullard*, 23 Miss. 88; *Curry* v. *Woodward*, 53 Ala. 371. The Statute of Limitations therefore presented no bar to a recovery by the receiver.

Questions of much greater difficulty are presented by the appeal of the receiver from that portion of the decree dismissing the bill, as to the defendant Farwell. It is contended that John V. Farwell was not only privy to the illegal acts of appellants above recited, but that he took this $23,208.33, as and for services rendered the Republic company as its president, after the services had been performed, and in the absence of any agreement with or action by that corporation binding upon it in law, and that he is primarily liable to the receiver, and should be required to refund the same, and if not primarily liable, he should at least be held jointly liable with Ellis, Peet and Nickerson.

As before seen, the contract of March 2, 1876, provides for the payment by Ellis, Peet and Nickerson of the gross sum of $66,000 for the stock of said Farwell,—$37,630 to be paid March 15, 1876, and $28,370 to be paid June 15, 1876, after Ellis, Peet and Nickerson should have obtained control of said company; and it is contended that the last payment of $28,370 was agreed and understood to represent the amount of salary to be voted to said Farwell from the funds of said companies, in pursuance of said alleged verbal agreement. It is to be remembered that this contention rests solely upon the testimony of Peet and Ellis. Nickerson expressly testifies that he had no interview or conversation with Farwell in respect to the purchase of his stocks, and that all he knew in respect

thereof he obtained from Peet and Ellis. On the other hand, John V. Farwell denies that there was any such agreement or understanding. He insists, that while the negotiations had been pending for the purchase of his stock, and the subject of salary had been discussed, he absolutely declined to negotiate upon the basis of receiving a salary as any part of the consideration for the sale of his stock. In this he is corroborated by the testimony of Charles B. Farwell, who testifies, that at the time of the execution and making of the agreement of March 2 there was no understanding or agreement not included in the written contract.

It is, however, contended, that an inference unfavorable to the defendant Farwell is to be drawn from the testimony of the witness Cortright, who testifies, that in January, 1876, Farwell proposed to sell him his stock, and said, at the time, that he had offered to sell it to Nickerson, Ellis and Peet at about twenty-six cents on the dollar, and they were to vote him a salary in case they got control of the company. This conversation the witness says was on the 26th of January, 1876, while the transaction was consummated, as it is conceded, between Charles B. Farwell and Ellis, Peet and Nickerson, on March 2, 1876. It is possible that a clue to much of the apparent difference in the versions rendered of this transaction may be found in the connection of Cortright therewith. It appears that he also held a considerable quantity of the stock of the company for which Ellis and Peet were negotiating, and that while willing, nominally, to take the price offered, he wanted a bonus of $40,000 for the transfer of his stock. Ellis testifies that he told Farwell of this demand of Cortright, and Farwell said, if anybody in that company was going to have a bonus he was the man,—he was going to have it; and it was about this time "that he made this demand for the salary." It is evident, from the account of the negotiations given, that Farwell demanded the round sum of $66,000 for his stock, and if, as suggested, conversations were had in

which he expressed a willingness to take a salary to be voted to him out of the funds of the Republic and National companies, he seems, prior to the consummation of the trade, to have declined to sell his stock otherwise than upon the personal liability of the purchaser. To what this change of purpose was due is not shown. It appears that Mr. Kales was the attorney of the Republic company, and also of John V. Farwell, and must have been cognizant of these transactions. He was also, it seems, a director, and whether the change of purpose, if it be conceded that the testimony of Cortright, Ellis and Peet shows that there was originally a demand for or willingness to take a salary as part of the consideration for the sale of the stock, was due to information obtained by Farwell from his counsel or from other sources, is not material.

If the statements of Ellis and Peet are received, there is no reason shown why the contract of sale was not consummated between them and John V. Farwell, personally. They each testify that the services of Farwell as president were worth from $5000 to $10,000 per annum during the time he was president of the company, and that they were willing that the company should pay it; that they thought he ought to have a salary; that they were willing to pay him twenty-six and a half cents for his stock and vote him this salary. It is not pretended that there was any disagreement as to the amount of the salary or the length of time for which it should be allowed. Why, then, was it necessary for Peet to interview Charles B. Farwell at Washington, and for Charles B. Farwell to come to Chicago to conclude these negotiations? There is, it seems to us, but one rational answer, and that is to be found in the statement of John V. Farwell, that Peet and Ellis proposed, when they obtained control of the company, that they would, as part of the consideration for the purchase of his stock, vote him a salary, and that he declined it, saying to them, "that he could not see it in that light." It may be that in consummating the contract with Charles B. Farwell, Ellis, Peet and

Nickerson had in mind that they would vote from the coffers of the corporation a salary to equal the difference between the price of the stocks at twenty-six and a half cents and the price agreed to be paid. But, as before seen, Charles B. Farwell expressly denies that any such purpose or intention was participated in by him in such negotiations or in the making of the contract, and the denial of John V. Farwell is equally explicit.

Unless John V. Farwell participated in the unlawful purpose to take from the funds of the company this sum of money, or some portion of it, he can not be held liable. If, for any reason, it became desirable to the appellants named, to purchase his stock, they undoubtedly had the right to do so, at such price as might be agreed upon; and if, for any reason, Farwell's stock was worth more than other stock in the market, the fact that more was paid for it would furnish no conclusive evidence of participation in the fraudulent purpose. Farwell had the right to demand and receive such price from purchasers of his stock as he could obtain, and the fact, if it existed, that the purchase of his stock by Ellis, Peet and Nickerson was necessary to their obtaining control of the corporations, which they desired, would not, either in law or morals, render it wrong for Farwell to demand and receive such sum as the purchasers thought it was to their interest to pay.

It is insisted, however, that the subsequent transactions show that Farwell participated in the purpose of Ellis and Peet, and it is said that an inference is to be drawn from the arbitrary division of payments provided for in the contract of March 2. The significance of this division is lost when it is remembered that it is not improbable, and indeed, from their evidence, is rendered certain, that Ellis and Peet had in contemplation the payment by the companies of a portion of the purchase price of these stocks, by voting the same out of the assets of the company as a salary to Farwell, which they could do only after the 14th of June, when they should obtain control of the corporations. It is not probable that Charles B.

Farwell would object to such division of the sum as they might desire, so that, so far as John V. Farwell is concerned, who was not present during the immediate negotiations leading to the making and signing of that contract, the fact of division being thus made is no more significant than if the amounts had been arbitrarily fixed at any other or different sum. However, on the day following the stockholders', directors' and committee meetings before referred to, (that is, on June 15, 1876,) Farwell received, as he alleges, under said contract, the second installment for the sale of his stock,—$28,370. The manner of this payment was by two checks, drawn on different banks, by the National Life Insurance Company, and payable to John V. Farwell & Co.,—one for $20,000 and the other for $9000. It is denied that the delivery of these checks was in payment of the last installment. Both Ellis and Peet testify that it was a loan of $29,000 made on that day, not to John V. Farwell, but to John V. Farwell & Co., and that John V. Farwell left his three notes, for $25,000 each, secured by trust deed, as collateral to such loan. It is denied by John V. Farwell, by Simeon Farwell, (who was the financial manager of John V. Farwell & Co.,) and by Charles B. Farwell, a member of that firm, that any such loan was made to or the money borrowed by John V. Farwell & Co. There is no contention by anybody that John V. Farwell had not performed every condition and agreement required of him by the contract of March 2, and that by the terms of that contract there was due him on said 15th day of June, $28,370. It is not comprehensible why he should make a loan on that day rather than collect the sum due him for substantially the same money. Moreover, it seems clear that no note or memorandum of such loan was then made or note or obligation given by Farwell. On that day, it is agreed by all these parties, the contract of March 2 was surrendered to Ellis or Peet, and cancelled.

There is a discrepancy between these parties as to when this payment was made, and by whom and to whom the con-

tract was surrendered up; but there is none whatever in respect to the fact that the contract was then surrendered by John V. Farwell, or some one for him, to Ellis and Peet, or one of them, with the knowledge of the other, and that thereafter he held no evidence of the obligation of Ellis, Peet and Nickerson to pay the last installment mentioned in such contract. There can be no doubt, from the course of dealing, that the parties understood that the obligations of the contract, on the part of Ellis, Peet and Nickerson, as well as upon the part of Farwell, had been performed. It is true that Ellis and Peet, or one of them, subsequently suggested,—that is, subsequent to their first examination,—that Farwell understood that this payment was put in the form of a loan, so as to cover up the real transaction, which, it may be stated, is also unequivocally denied by Farwell. Why should the real transaction be covered up? Ellis, Peet and Nickerson all swear,—and in that they are not contradicted,—that they consulted their attorney, before mentioned, in respect of whether it was lawful to vote and to pay to Farwell a salary for his past services out of the funds of the corporations; that they went together to said attorney; that he advised them that it was right and perfectly lawful for them to do so; and that in all they did in respect thereof they acted in good faith, under his advice. And Ellis and Peet testify that the services of Farwell were worth, as already stated, from $5000 to $10,000 per year; that in their judgment he had earned that much, ought to have it, and that they were willing to pay it to him. Now, if that were true, and it was understood by Farwell that he was getting the money as and for salary for his past services, what possible objection could there have been to giving the transaction its true and legitimate coloring and effect? Manifestly, if they were acting upon the advice of their counsel that they had a right to make the payment, and that it was legitimate and proper, if they had no ulterior purpose to serve, and Farwell understood that it was a carrying out of the contract

of March 2 by voting him a salary, there could have been no reason why it should have been covered up in the form of a loan.

It is, however, shown, that the drafts mentioned contained the words, "for Col. Loan," and it is said that that furnishes some evidence tending to corroborate the statements of Peet and Ellis. It is explained that the words "for Col. Loan" refer to a collateral loan, or a loan secured by collaterals. It is conceded by Farwell that there were in the vaults of the Republic, on the 15th of June, 1876, three notes, signed by himself, for $25,000 each, secured as mentioned; but it is shown, and not denied, that they had been previously hypothecated as collateral to a loan made by Farwell of $50,000, which had been paid, and then had been left as collateral to a subsequent loan of $10,000 to one Jacobs, and perhaps other loans, which, it would seem, had not then been paid. It is not clear when the note of Jacobs was in fact paid. In respect of the words in the drafts, "for Col. Loan," their significance would depend very much upon whether or not they referred to collaterals put up by Farwell or by some one else, and whether Farwell knew or had his attention called to their insertion in the drafts. It is certain that $23,208.33 of the salary proposed to be paid Farwell, according to the version of Peet and Ellis, was to be paid by the Republic company, while only $5208.33 was to be paid by the National. It is clearly shown, and undisputed, that the entire sum of $29,000 was, on the 15th day of June, 1876, taken from the moneys of the National Life company, and that at least $23,208.33 thereof was a loan to the Republic Life by the National company. Whether we accept the statement of Farwell that he gave permission to use the collaterals remaining with the National Life to secure this loan to the Republic Life, or not, the fact remains that here was a loan to which the words, "for Col. Loan," might reasonably refer. In any event, these words, unless, in fact, the National Life was making the loan to John

V. Farwell & Co., would possess no significance whatever, and
would, in any event, be subject to explanation. It might well
be asked, if the claim and version of Ellis and Peet are to be
received,—that the loan was merely colorable,—what was the
necessity of requiring collaterals at all? Moreover, it seems,
as before said, that no note was taken evidencing the loan.
No interest was charged,—at least upon $28,370 of the amount
of the pretended loan; and finally, upon the 30th of October,
1876, it was in part cancelled by crediting John V. Farwell,
under the head of "Surrenders," on the books of the Republic
Life company, with $23,208.33. And on the cash book of the
Republic Life, on the same day,—October 30, 1876,—there
was a debit entry of cash from the National Life Insurance
Company of the like amount, which was charged to the ac-
count of "Surrenders;" and the same entry was carried into
the journal and ledger accounts of that company.

Ellis, Peet and Nickerson, and their associates, were in pos-
session and control of these two corporations and their records
from June 14, 1876. If the National company in fact loaned
to John V. Farwell & Co. $29,000, it is inexplicable that the
evidence thereof should not have been preserved in any note
or obligation of that firm, or at least by entries thereof in the
books of the corporation. Besides, on the day before, these
same men and their associates, members of the finance com-
mittee, as we have seen, voted to pay John V. Farwell this
large sum of money belonging to the two corporations, for past
services as president, and such salary, if paid at all, it is con-
ceded, was ultimately paid out of and by means of these
checks. But the books of the corporation, kept and controlled
by said appellants, show no entry of such payment until Oc-
tober 30, 1876, when we find it entered and charged to the
account of "Surrenders." It is not pretended by Peet or Ellis
or Nickerson that they had received any further advice or ad-
ditional light in respect of the propriety or legality of their
payment of such salary; yet when the entry is finally made

upon the books, it is falsely put, as it would seem, as if that sum had been paid by the company for and on account of the surrender of its policies of insurance. It is true that Peet and Ellis attempt to explain this by the statement that it was thus charged because they thought it would look badly upon the books of the company if so large an item expended for salary should be entered in any one year. This explanation, in view of their professed understanding that the payment was legitimate and authorized, is worse than no explanation at all. The purpose and object of keeping books of the company were to show its financial condition, and an entry made intending to deceive the stockholders, creditors or others, by no means relieves the entry from the suspicion which properly attaches to it. If the only purpose was that claimed, precisely the same result,—of deceiving those who might see the books,— would have been accomplished had the entry been made upon the 15th of June, instead of the 30th of October. By the entries it is made to appear that on the 30th of October, 1876, the Republic company received in cash from the National Republic $23,208.33, when no such transaction in fact took place, and the only thing shown in the nature of a voucher for these entries was a ticket, in the handwriting of Ellis, as follows :

"*Debit.*

Oct. 30, 1876.—J. A. E. Surrenders, John V. Farwell, salary as president, four years, at $4500 per annum, - - - - - - - $18,000.00
Two and a half years, at $2500 per annum, - 5,208.33

$23,208.33

By order of the Executive Committee.
*June 14, 1876.*—Page 114 of Records."

The evidence shows, the initials "J. A. E." on the ticket were those of J. Alder Ellis, then president of the Republic, and that by the term "Surrenders" is meant the amount paid

34—137 ILL.

for policies that were surrendered to the company, and possibly expenses in connection with the purchasing in of the same. That these entries are fictitious in the manner in which they were made, is conceded.

Again, the fact that the two checks, aggregating $29,000, exceeded the amount of the installment last due under the contract of purchase, is said to be inconsistent with the position of Farwell, and to support the contention of appellants. It is a circumstance calling for explanation. It seems clear that there were other transactions with the National Life Insurance Company, with which John V. Farwell was more or less intimately connected, and for which, as we have seen, as in the instance of the loan to Jacobs, Farwell's collaterals were pledged ; and it is equally clear that the difference between the amount due under the contract of March 2, and the $29,000 evidenced by the checks named, was subsequently carried to the private account of John V. Farwell. Indeed, it appears that on October 30 the following entries were made upon the books of the National Life Insurance Company :

"1876.

Oct. 30.—Cash to . . . . . . . . . . - ÷ - - - $29,000
           Col. Loans No. 26, John V. Farwell & Co.   29,000

Oct. 30.—Sunds. to cash, -   -    -    -    - $29,000
           Republic Life Ins. Co.  3083  $23,208.33
           Surrenders,   - ·  -  3084    5,208.33
           J. V. Farwell, his acct.  3085     583.34

                                $29,000.00 $29,000"

No other entry of the loan seems to have been made on the books of the National Life, and this, as we have seen, was upon the closing of that transaction between the Republic Life and the National Life, on the 30th of October, when the balance seems to have been then charged to Farwell. Farwell also testifies that he had a $10,000 policy, on which he had paid five or six premiums, and which he surrendered to the

company at its surrender value, and that the excess may have been paid him on that account; but in respect of this his statements are neither clear nor certain. His explanation, made long after the transaction in fact took place, while not entirely satisfactory, is not inconsistent with his position throughout. The explanation given by Ellis and Peet, while consistent with their theory that the checks paid salary, is wholly inconsistent with the theory that there was a loan to John V. Farwell & Co. If they made a loan of $29,000 to John V. Farwell & Co., by what authority were they authorized to charge a portion of the loan to the Republic Life and the balance to the private account of John V. Farwell?

In view of the facts disclosed, the stock of the corporation can not be said to have had any fixed market value. It was not listed at any stock exchange, nor were quotations of the market value given, and, as we have already said, so long as Farwell consented to no arrangement, and participated in no design or purpose to derive profit, or to sell his stock to the corporation, or to receive in lieu thereof any of the funds or assets of the corporation, or to accept or receive the same as salary for past services as an officer thereof, it is no reason why he might not sell his stock to whomsoever he could, and at such prices as he could legitimately obtain. Nor is any inference unfavorable to Farwell justified from the fact that he knew Ellis, Peet and Nickerson desired his stock for the purpose of securing control of these corporations, and that in the agreement of sale he stipulated to vote his stock at the annual stockholders' meeting so as to place Ellis and his associates in its official control, and to deliver to them his resignation as one of its officers. Farwell's stock was private property. He had a right to sell it for as much as he could get, and Ellis, Peet and Nickerson a perfect right to buy it as favorably as they could. While Farwell held it he had a perfect right to vote his executory purchasers into the directory of the company. True, it is shown that afterwards such pur-

chasers proceeded to divert a portion of its funds; but there is no evidence shown that Farwell had notice of any intent on their part to wreck the corporation or do any other unlawful act in respect thereof, and the weight of proof, as we have found, tends to establish that he in no way consented to such unlawful misappropriation of the assets of the corporation. It is clear, moreover, that from the 14th day of June, 1876, Farwell practically ceased his connection with the Republic Life. Immediately upon the election of the new directory of the National Insurance Company he placed his resignation in the hands of Ellis, Peet and Nickerson, to take effect at such time as they should specify. It appears that no formal entry of such resignation, or of its acceptance by the company, was made until in November, 1876. The fact, however, is, that Farwell ceased any active connection with the Republic, and that at the time of the passage of the resolution by the executive committee, by which it was proposed to pay him a salary, he was neither president nor an acting director of the corporation,—either of the Republic or National. There is in this record no evidence tending to show that Farwell was ever present or participated in any meeting or action of the directory of either of said corporations after the election of the new directory, on the 14th of June, 1876, except a recital in the record of those who were present at a meeting of the board of the directory of the Republic held October 11, and the impression of a witness that he was present at such meeting. Farwell, again, unequivocally states that he was not present at that or any other meeting of the board of directors after June 14. It is not shown, if it be conceded that he is mistaken, that he took any part in the action of the board on that occasion, or that any business was then transacted in respect of the matters here being considered.

These various contentions of fact resolve themselves into the simple proposition whether Farwell's position is sustained, or whether that of appellants is to be received as the correct

version of these transactions. The conflict is sharp, and in :many respects vital to the determination of the cause, and the .court must accept and believe one set of facts and disbelieve :the other. There would seem to be no middle ground. The ·chancellor who sat at the hearing of the cause saw the wit-·nesses and heard them testify, with opportunities of determining the weight and credit that should be given to their testimony, which we do not possess. He was satisfied that the weight of testimony failed to sustain the allegations in the bill' as to the defendant Farwell, and entered his decree dismiss-:ing it as to him; and as held in *Coari* v. *Olsen*, 91 Ill. 273, the same necessity here exists as when there has been a trial by jury, that the error in the finding of fact by the chancellor must be clear and palpable, to authorize a reversal. This holding has been sanctioned in many cases by this court, and therefore, unless we can say, from a review of the facts in .this· record, that the chancellor was clearly wrong in his find-·ing, the decree must be affirmed. In the light of the facts and circumstances shown, while there may be circumstances that might be more satisfactory with further explanation, yet upon the whole case we can not say that the trial court clearly and palpably erred, but are of opinion that he reached the most satisfactory conclusion attainable from the proofs.

Finding no error in the record, the judgment of the Appel-, late Court is affirmed.

*Judgment affirmed.*

Mr. JUSTICE MAGRUDER took no part in the decision of this case.

Mr. JUSTICE SCHOLFIELD, dissenting.