HARRY E. BOVAY and KENYON D. WELLS, Trustees in Bankruptcy of VICKSBURG BRIDGE & TERMINAL COMPANY, a corporation of the State of Delaware,

*vs.*

H. M. BYLLESBY & COMPANY, a corporation of the State of Delaware, and FEDERAL SECURITIES CORPORATION, a corporation of the State of Illinois.

*New Castle, October 9, 1941.*

*Daniel O. Hastings* and *Caleb R. Layton, 3rd,* for complainants.

*Aaron Finger,* of Richards, Layton & Finger, for defendants.

THE CHANCELLOR: The complainants seek a decree against the defendants for the payment of $1,176,765.16, with interest. The amount claimed to be due is made up of numerous items, with interest from various dates, mostly in April and May of 1928. The case grows out of certain alleged transactions between the Vicksburg Bridge & Terminal Company and the defendants at a time when Byllesby & Company is alleged to have occupied the position of a promoter toward the Bridge Company, and to have controlled its actions through nominees on its corporate board. All of these transactions are alleged to have been grossly unfair

to the latter corporation, and to the great advantage of the defendants. Most of the material facts were stated with some particularity, in an opinion filed by this court on a demurrer to the original bill. *Bovay, et al., v. H. M. Byllesby & Co., et al.*, 25 *Del. Ch.* 1, 12 *A. 2d* 178. Some additional facts are, however, alleged in the present bill.

Through the efforts of one Harry E. Bovay, Congress granted to an Arkansas corporation a franchise to erect a bridge across the Mississippi River, at Vicksburg, Mississippi, to a designated point in the State of Louisiana. Bovay was the president of the Arkansas corporation, and owned all of its capital stock. He subsequently interested the defendants in financing the construction of the proposed bridge, and, as the result of a series of agreements and subsequent modifications thereof, the franchise was finally transferred by the Arkansas corporation to the Vicksburg Bridge & Terminal Company of Delaware. By the various agreements and subsequent modifications thereof, Bovay ultimately received one-third of the stock issued by the Delaware corporation and $123,666.00 in cash; of which sum $23,-666.00 was to cover certain promotional expenses. The whole of this sum was paid to Bovay in the first instance either by Byllesby & Company or by Federal Securities Corporation, but later the Bridge & Terminal Company reimbursed Byllesby & Company for the amount so paid.

Pursuant to contract, and as a part of the transaction accompanying the assignment of the bridge franchise, the defendants, on the other hand, agreed to purchase for $6,-299,000.00 in cash, $7,000,000.00, principal amount of the bonds and debentures issued by the Delaware corporation and the remaining two-thirds of its stock. Under one of the prior agreements, it had been provided that the stock of the Bridge & Terminal Company should be issued in such manner that Bovay's one-third part would have sixty percent of the voting power; but, by a subsequent agreement, he relinquished that special right, and only one class of

stock was issued. The Bridge Corporation also agreed to employ Bovay at a specified salary. In due course, the defendants deposited $6,347,666.67, to the credit of the Delaware corporation, in the Continental National Bank & Trust Company of Chicago. Of that sum, $6,299,000.00 was the contract price for the bonds, debentures and stock of the corporation, which the defendants had agreed to purchase; the balance represented the accrued interest thereon. Apparently, the stock was regarded as having no real value, and was a part of the consideration in purchasing the bonds and debentures. This would seem to appear from the various contracts attached to the bill.

On April 3rd, 1928, a contract dated March 1st of that year was also entered into between the Bridge Corporation and the Chicago Bank which provided precisely how the fund so deposited should be disbursed. Bovay, though a director of the corporation, was not present at that meeting. The other directors present were all employees of, and are alleged to have been under the control of the defendants, or of one of them. It seems, however, that Federal Securities Corporation was more or less subject to the control of Byllesby & Company, its more active associate, and in fact retired from business in June of 1929.

The bill also alleges that the amount paid by the defendants to the Bridge Corporation represented ninety percent of the face value of the bonds and debentures purchased; that nothing was paid for the stock issued to the defendants, though it had been previously valued by the corporation at $5.00 per share; that the sum of $123,666.00 paid to Bovay, when he relinquished his right to sixty percent of the voting power of the corporation, should have been paid by the defendants, or by one of them, and not from the funds of the Vicksburg Bridge & Terminal Company of Delaware; and that the various amounts disbursed, under the authority of the disbursement agreement, should not have been paid out of corporate funds.

The various amounts alleged to be due the corporation for moneys illegally and unfairly retained by the defendants and for moneys illegally and unfairly paid to them from corporate funds, and the dates of such payments are:

1. April 12th, 1928—$700,000 alleged to be discount on the bonds and debentures of the Vicksburg Bridge & Terminal Company of Delaware, purchased by the defendants from that corporation at ninety percent of their face value.

2. April 12th, 1928—$123,666.00, paid by one of the defendants to Bovay to secure control of the Delaware corporation, and which was repaid to Byllesby & Company from the funds of the Bridge & Terminal Company.

3. April 12th, 1928—$199,000.00, being the alleged fixed value of 39,800 shares of no par stock of the Bridge & Terminal Company; the certificates for which were issued to the defendants, and which sum represented the value of that stock at $5.00 per share.

4. May 1st, 1928—$22,644.38, reimbursement of promotion and preorganization expenses incurred by said defendants, and consisting of salaries and expenses paid to Bovay and McCuing under the agreement of June 7th, 1926.

5. May 1st, 1928—$1,051.09, for traveling expenses of representatives of the defendants prior to the organization of the Delaware corporation, but in connection with the bridge project.

6. May 1st, 1928—$11,543.33, expended by the defendants, prior to the organization of the corporation, for highway and railway traffic reports for their own use and benefit in the investigation of the proposed bridge project, and in subsequently marketing the said securities.

7. May 1st, 1928—$27,225.53, paid to defendants to reimburse them for legal opinions on, and approval of, the

securities issued by the Bridge Corporation, together with other legal services connected with the marketing thereof.

8. May 1st, 1928—$18,301.67, to reimburse the defendants for expenditures made in connection with the project for the possible construction of a bridge at Natchez, Mississippi, and in no way connected with the business of the Vicksburg Bridge & Terminal Company.

9. $10,833.16, paid to Byllesby & Company on the representation that the same was due William G. Pohl, secretary-treasurer of the corporation, and an employee of Byllesby & Company, as a salary for his services at the rate of $416.66 per month, for the months beginning with March 28th, 1928; such salary was never fixed by corporate authority, and, as a matter of fact, was never received by the said Pohl, but was appropriated by Byllesby & Company to its own use.

10. $5,250.00, representing checks drawn for various corporate salaries, for several months, beginning about February or March, 1931, fixed by appropriate corporate action, but which were endorsed by the payees therein, and delivered to Byllesby & Company, and cashed by it. All of these persons were also employees of the defendants, or one of them.

11. $7,250.00, representing monthly checks of the corporation, for several months beginning with and subsequent to September 1st, 1932, drawn to the order of Mord M. Bogie, as chairman of the financial adjustment committee, and also an employee of Byllesby & Company, which checks were, however, turned over to that company, and cashed by it.

12. May 1st, 1928—$50,000.00, paid to Byllesby & Company to reimburse it for alleged further expenses incurred in the promotion and preorganization activities of the Bridge Corporation, and in marketing its securities.

All of the above amounts, with the exception of the last item of $50,000, were also set out in the original bill, and a decree based thereon was sought by the complainants. The alleged right of action relied on by them as trustees in bankruptcy, is clearly a corporate right, in the nature of a chose in action. Primarily, a mere decree for the payment of money is sought, and there may be a concurrent remedy at law, but under the circumstances it would be wholly inadequate to determine the rights of the parties. *Bovay, et al., v. H. M. Byllesby & Co.*, 25 *Del. Ch.* 1, 12 *A.* 2d 178. The reasons for this conclusion were stated in that opinion.

The defendants point out that *Section 4367 of the Revised Code of 1935*, in part, provides:

"* * * that the Chancellor shall not have power to determine any matter wherein sufficient remedy may be had by common law or statute, before any other Court, or jurisdiction, of this State; but that where matters, determinable at common law, shall be brought before him in equity, he shall remit the parties to the common law; * * *."

But that statutory provision is merely declaratory of the old English equity practice. *Kahn v. Orenstein*, 12 *Del. Ch.* 344, 114 *A.* 165. The fact that none of the cases cited by the court in *Bovay, et al., v. H. M. Byllesby & Co., supra*, involve similar statutory provisions would, therefore, seem to be a matter of no moment.

Ordinarily, though a fraud has been perpetrated on a corporation by persons occupying a fiduciary relation toward it, if all of its stockholders consented to the transaction, with full knowledge of the facts, the corporate right cannot be enforced. *Old Dominion Copper, etc., Co. v. Lewisohn*, 210 *U.S.* 206, 28 *S. Ct.* 634, 52 *L. Ed.* 1025; *Henderson, et al., v. Plymouth Oil Co.*, 16 *Del. Ch.* 347, 141 *A.* 197; *Bovay, et al., v. H. M. Byllesby & Co., supra.* This is because in equity the stockholders of a corporation are ordinarily its real owners. But a somewhat different situation may arise when the corporation is insolvent. There creditors, rather than stockholders, are primarily interested in its assets.

Stockholders may have possible, ultimate rights, but in most cases they can hardly be regarded as more than mere nominal owners, having little or no equity in the corporate assets. In these circumstances, there are cases where it would seem to be wholly unfair to creditors to permit the action of stockholders to bar or discharge a clear corporate right. *McCandless v. Furlaud*, 296 *U. S.* 140, 56 *S. Ct.* 41, 80 *L. Ed.* 121. But, whatever the rights of individual creditors may be in such cases, the precise question is whether trustees in bankruptcy, largely acting for them, can have any greater rights than the corporation could have had. In the distribution of the assets of a bankrupt corporation, a receiver occupies a position toward both creditors and stockholders somewhat analogous to that of a trustee. *High on Receivers,* §§ 314, 315; *Curtis v. Leavitt,* 15 *N. Y.* 9; *Alexander v. Relfe,* 74 *Mo.* 495. In enforcing alleged rights of action in the collection of corporate assets, he usually acts as the representative of the corporation, and has no greater rights or powers. *High on Receivers,* § 315; *Curtis v. Leavitt, supra; Alexander v. Relfe, supra.* Where, however, the insolvent corporation has perpetrated a fraud on its creditors, by an illegal and improper disposition of its assets, a somewhat different situation arises. *High on Receivers,* § 315; *Curtis v. Leavitt, supra; Alexander v. Relfe, supra.* Under such circumstances, it seems that the receiver may enforce the rights of creditors, and in so doing has even greater rights than the corporation could have had. *High on Receivers,* § 315; *Curtis v. Leavitt, supra; Alexander v. Relfe, supra; Hamor v. Taylor-Rice Eng. Co., (C.C.)* 84 *F.* 392. *McCandless, v. Furlaud supra,* apparently applied that eminently practical rule. There, as here, the fraud relied on was for the most part perpetrated on the corporation at or about the time of its organization, and was of such a nature as to cause insolvency at the very inception of its business life. Because the rights of stockholders were not involved, a majority of the court differentiated that case from *Old Dominion Copper, etc.,*

*Company v. Lewisohn,* 210 *U.S.* 206, 28 *S. Ct.* 634, 52 *L. Ed.* 1025. The latter case was approved and followed in *Henderson, et al., v. Plymouth Oil Company,* 16 *Del. Ch.* 347, 141 *A.* 197, which is binding on this court; but the distinction made in the *McCandless* case seems sound. It, therefore, governs this phase of the case in all of its aspects. True, the complainants are trustees in bankruptcy of the Vicksburg Bridge & Terminal Company, and not receivers, but the principle involved is the same. See *Bovay v. H. M. Byllesby, & Co., supra.*

Nor are the complainants' rights as representatives of creditors of the bankrupt corporation barred by laches, either before or after the appointment of the receiver. The rules governing laches were considered at some length in the opinion filed at a prior stage of this case. *Bovay, et al., v. H. M. Byllesby & Co., supra.* That defense is based on the elementary rule that "he who seeks equity must do equity." Ordinarily, therefore, mere delay in asserting even a known right does not constitute laches. Some change in position to the disadvantage of another is essential. Statutes of limitations as such, are not binding on a court of equity. But when there is a concurrent remedy at law, in the absence of unusual circumstances, the analogous statutory period is frequently, and perhaps usually, applied in determining whether the complainant has been guilty of such unreasonable and prejudicial delay in bringing suit as to prevent any possible recovery. See *Bush v. Hillman Land Co.,* 22 *Del. Ch.* 374, 2 *A.* 2d 133; *Wright v. Scotten,* 13 *Del. Ch.* 402, 121 *A.* 69, 31 *A. L. R.* 1162; 4 *Pomeroy's Eq. Juris.* (*4th Ed.*) § 1441. In such cases, when a longer delay appears, prejudice is usually presumed (*Bovay, et al., v. H. M. Byllesby & Co., supra;* 4 *Pomeroy's Eq. Jur.,* §§ 1441, 1457); but the application of the general rule necessarily depends on the particular circumstances. *Bay Newfoundland Co. v. Wilson & Co.,* 24 *Del. Ch.* 30, 4 *A.* 2d 668; *Wright v. Scotten,* 13 *Del. Ch.* 402, 121 *A.* 69, 31 *A. L. R.* 1162; *Bovay, et al., v.*

*H. M. Byllesby & Co., supra.* An apparent unreasonable delay may, therefore, be explained and excused by the pleader. *Bovay, et al., v. H. M. Byllesby. & Co., supra;* 4 *Pomeroy's Eq. Jur.,* §§ 1441, 1457, *supra.*

The most important of the transactions complained of occurred in 1928, though some were in, and several months after, March of 1931 and September of 1932. The complainants were appointed receivers of the corporation January 30th, 1934, and this suit was brought February 1st, 1939. The payments of interest on the debentures and bonds did not cease until March of 1932 and September of 1933, respectively. Until then creditors neither knew, nor had reason to suspect, that any such fraud as is alleged had been committed on them by the defendants. *Bovay, et al., v. H. M. Byllesby & Co., supra.* Bovay, though one of the complainants in the action, is merely acting in a representative capacity; and conceding that he knew all of the facts at a much earlier date, his knowledge could not be imputed to creditors.

On March 1st, 1934, or one month after their appointment, the receivers applied to the court for authority to bring suit against the defendants "upon one or more of the items covered by the present action"; and also requested that an audit of the books of the corporation be made. The audit was authorized, but no authority was given to bring suit. A financial adjustment committee and a bondholders protective committee, organized by Byllesby & Company, and of which Shinners, one of its officers, was chairman, intervened in the receivership proceedings. On motion of these committees, the order of the court of March 1st, 1934, directing an audit was suspended. An auditor was, however, finally appointed in August of 1934, but his report was not filed until November of that year. The receivers were harrassed and delayed in bringing suit against the defendants by litigation fomented by them which subsequently caused reorganization proceedings in the bankruptcy court.

On February 12th, 1934, the Vicksburg Bridge & Terminal Company was adjudicated a voluntary bankrupt by a Federal District Court in Mississippi. On November 21st, 1934, a petition was filed to reorganize the corporation, under the provisions of *Section 77B of the Federal Bankruptcy Act*, 11 *U.S.C.A.* § 207. Said petition was allowed August 1st, 1935, and the complainants, who had been the receivers, were appointed trustees. At that time they again sought permission of the court to bring suit against the defendants. Authority was, however, withheld because of the opinion of the presiding judge of the bankruptcy court that the prior report of the auditors in the receivership proceedings, which had been filed November 24th, 1934, should be amplified and corroborated by an investigation of the affairs of the bankrupt corporation by a special master. An order to that effect was accordingly entered January 9th, 1935. After a preliminary investigation, the master recommended that a hearing be held by him in Chicago, and authority to that effect was given by the court. The hearing was originally set for a date in the month of June, 1935, but was postponed at the request of representatives of the financial adjustment and bondholders committees, which had been organized by the defendants, and were acting in their interest. The hearing before the master finally started late in September of 1935, and was concluded about the middle of October of that year. The master died within less than a week after his return from Chicago. On November 1st, 1935, a transcript of the testimony, taken before him, was filed with the court in lieu of a formal report. Shortly thereafter, the trustees in bankruptcy were orally instructed by the court to bring suit against the defendants in the United States Court for the District of Mississippi, but only after submitting to the presiding judge the proposed bill of complaint, together with an order for filing it. Due to the lengthy absence of the judge, attending court in other jurisdictions, followed by a protracted illness, his approval of

the bill, and the entry of the order for starting suit, could not be obtained until late in the month of June 1936. On the twenty-ninth day of that month, an action similar to the present one was brought by the complainants against the defendants in the United States District Court in Mississippi; that being the court having charge of the reorganization proceedings in bankruptcy. The case was dismissed on jurisdictional grounds, and the judgment of the lower court was subsequently affirmed by the Circuit Court of Appeals, 5 *Cir.*, 88 *F.* 2d 990. The opinion of that court was handed down March 18th, 1937. The trustees in bankruptcy then sought authority from the court to take the case to the Supreme Court of the United States. Action on that application was delayed by the bankruptcy court, and was finally denied. On many occasions thereafter, between March, 1937, and January, 1939, the matter of reinstituting the suit in a court of the defendants' domicile was discussed by the complainants, or their counsel, with the presiding judge, and instructions requested in relation thereto. Authority to take action was, however, withheld by the judge on the ground that it would first be necessary (1) to determine the issues then pending before the court, as to the validity of the first mortgage bonds and the deed of trust securing them; (2) to determine the question of the solvency of the corporation, which was asserted by the stockholders; and (3) to obtain the approval of the security holders to a plan of reorganization.

A reorganization plan was finally prepared by one, or both, of the Shinners' committees, and presented to the court in December of 1937. In subsequent decrees of the court, dated March 30th and May 3rd, 1938, the reorganization plan was finally approved, though jurisdiction was reserved "to determine whether or not to permit and direct the trustees of the debtor to institute action against H. M. Byllesby & Company and/or Federal Securities Corporation * * * and if such suit is brought, to control and supervise the conduct of the trustees of the Debtor therein."

In response to further requests for instructions, as to whether suit should be brought against the defendants, the trustees were advised by the presiding judge of the bankruptcy court that his decision, with regard thereto, must wait the determination of the pending matters above referred to, among other reasons, because it would be necessary to ascertain whether a sufficient amount of money would be·retained to defray the probable costs of litigation in the courts of Delaware. Notwithstanding the matter was oftentimes discussed by the trustees, or by their counsel, with the presiding judge, and authority to bring suit was repeatedly requested, that request was refused until January 5th, 1939, on which date an order was entered.

Shinners, the vice-president of H. M. Byllesby & Company and chairman of the bondholders committee,· which had participated in both the receivership proceedings and the subsequent reorganization proceedings, "was at all times aware that the receivers, and later their successors, the trustees, contemplated institution of the action when, as and if authorized to do so by the Court which appointed them."

Moreover, the amended bill alleges:

"Upon information and belief, that there has been no change of position on the part of either of the defendants herein, pending the delay in bringing suit, and neither has suffered any prejudice by reason of any such delay.

"Alternatively, any change of position by either defendant herein was made with full notice and knowledge on its part that suit was contemplated and was likely to be instituted to procure the relief prayed for in this suit."

In view of the facts alleged, it would be unfair to creditors of the corporation to apply the analogous statutory period of limitations, governing actions at law, in determining whether the complainants are guilty of laches in this case. The apparent delay in bringing suit was caused by a variety of circumstances, over which the complainants had

no control, but which has not injured the defendants. Delay was in some measure caused by the acts of one of the defendants, or by one of its agents; but perhaps the courts controlling the actions of receivers and trustees were more responsible for it. There was certainly no laches on the part of creditors prior to the appointment of receivers on January 30th, 1934. Any subsequent delay also seems to be excused by the allegations of the bill. The receivers were never authorized to bring suit. The complainants, as trustees in bankruptcy, were subsequently authorized to file a bill in the United States District Court in Mississippi, but relief was denied on jurisdictional grounds. The opinion of the United States Circuit Court of Appeals, 5 *Cir.*, 88 *F.* 2*d* 990, sustaining the judgment of the court below, was handed down March 18th, 1937, while this suit was not authorized by the bankruptcy court until January 5th, 1939. No dates appear, but there were various, subsequent conferences, though perhaps of an informal nature, with the presiding judge of the bankruptcy court between March of 1937 and January of 1939, at which instructions were requested by the complainants with respect to the filing of a bill in Delaware against the defendants. The reasons given by the judge for withholding authority to bring suit are alleged. Explanations for the delay, subsequent to the order of May 3rd, 1938 also sufficiently appear.

For these reasons, the demurrer to the complainants' amended bill is overruled. An order will be entered accordingly.