HARRY E. BOVAY and KENYON D. WELLS, Trustees in Bankruptcy of Vicksburg Bridge and Terminal Company, a corporation of the State of Delaware,

Complainants Below, Appellants,

*vs.*

H. M. BYLLESBY & COMPANY, a corporation of the State of Delaware, and FEDERAL SECURITIES CORPORATION, a corporation of the State of Illinois,

Defendants Below, Appellees.

*Supreme Court, On Appeal, May. 17, 1944.*

LAYTON, C. J., and RICHARDS, RODNEY, SPEAKMAN, and TERRY, sitting.

*Daniel O. Hastings* and *Caleb R. Layton, 3d,* of the firm of Hastings, Stockley & Layton, for appellants.

*Aaron Finger* of the firm of Richards, Layton & Finger, for appellees.

LAYTON, Chief Justice, delivering the opinion of the court:

This is an appeal from a decree of the Court of Chancery dismissing an action brought by the complainants, trustees in bankruptcy of Vicksburg Bridge and Terminal Company, a Delaware corporation, in reorganization under *Sec-*

*tion 77B of the Bankruptcy Act,* 11 *U.S.C.A.* § 207, to compel the defendants to account for and refund large sums of money which they unlawfully and fraudulently took from the bankrupt corporation through the agency of its officers and directors who were named and controlled by the defendants.

The averments of the bill of complaint have been recited at length in one or more of the opinions of the court below to which reference will be made later. An outline of the complaint will serve for the purpose of the decision here.

The story of corporate financing and manipulation as told by the bill of complaint is somewhat extraordinary even for the period that ended so abruptly in October, 1929. Briefly it is this: Harry E. Bovay, one of the complaining trustees, conceived the idea of constructing and operating a railway and vehicular traffic toll bridge across the Mississippi River, at Vicksburg, Mississippi, to a point opposite on the Louisiana shore, and, in 1926, he succeeded in procuring the passage of an Act May 3, 1926, 44 *Stat.* 388, granting the consent of Congress to an Arkansas corporation, wholly owned by him, to construct, maintain and operate such a bridge under certain terms and conditions. This congressional consent is referred to by the parties as the bridge franchise.

Bovay interested the defendants in financing the project. It appears that Federal Securities Corporation is now but a nominal party, and the name, Byllesby & Co., when used, will refer to both defendants or to Byllesby & Co. alone as occasion shall serve. The first agreement between the parties contemplated the formation of a corporation with voting control lodged in Bovay. But, as will appear later, the defendants refused to proceed under this arrangement, and without Bovay's consent, in December, 1927, formed a corporation under the laws of this State with a capitalization of 60,000 shares without par value. This is the corporation now in bankruptcy, and it will be referred to as the bankrupt. The original board of directors selected for organization

purposes fixed the value of the shares at $5.00 a share. In January, 1928, Bovay caused his Arkansas corporation, by formal instrument of assignment, to transfer the bridge franchise to the bankrupt in consideration of one dollar and other good and valuable considerations; but notwithstanding this formal transfer, the parties proceeded to treat the franchise as, in reality, Bovay's property, and a proper subject of further negotiations.

About this time the defendants declined to proceed with the project with Bovay in voting control of the corporation, and another agreement was made whereby Bovay was to receive 20,000 shares of the capital stock, and the sum of $100,000.00 to be paid by the bankrupt, in consideration of his surrender of voting control; and as the matter developed, Bovay received the 20,000 shares, Byllesby & Co. 39,800 shares and Federal Securities 200 shares.

The dates of the several acts and events do not appear to be wholly in proper sequence, but as the complaint relates the occurrences it appears that on February 2, 1928, Bovay made to the bankrupt what was called a "firm proposal", by the terms of which he proposed to cause his Arkansas corporation to assign the bridge franchise, as if owned by it, to the bankrupt, and to cause the defendants to enter into a contract to purchase $5,000,000.00 principal amount of the bankrupt's First Mortgage Bonds, $2,250,000.00 principal amount of its debentures and two-thirds (40,000 shares) of its total capital stock, for the sum of $6,525,000.00, in consideration of the payment to him by the bankrupt of the sum of $123,666.00 in cash on or before March 1, 1928, the issuance to him of one-third (20,000 shares) of its total capital stock, and a monthly salary of $1000.00 from March 1, 1928, until the opening of the bridge for traffic. The proposal seems to have been immediately accepted by the bankrupt through one Shinners, acting as vice-president; and on the same day, the bankrupt made an agreement in writing with the defendants for the purchase by them of the bankrupt's secur-

ities in accordance with the terms of Bovay's proposal. This agreement was executed on behalf of the bankrupt by Bovay, its president, and Pohl, its secretary; on behalf of Federal Securities Corporation, by Clarke, its president, and Wilder, its secretary; and on behalf of Byllesby & Co., by Briggs, its vice-president, and List, its assistant secretary.

On February 10, 1928, some days after the occurrences above related, Bovay and the defendants made an agreement with respect to the constitution of the board of directors of the bankrupt, as well as an executive committee. It was agreed in writing that the board of directors should consist of nine members. Four members, including Bovay, were named in the writing; the remainder were to be named by the defendants. The executive committee was to consist of Bovay, Shinners, or other nominee of Byllesby & Co., and Wilder, or other nominee of Federal Securities Corporation. But, it seems that on the day before, that is February 9, a special meeting of the board of directors of the bankrupt was held in Chicago, at which meeting, Bovay, Shinners and Clarke were elected directors to take the place of the original directors chosen for the purpose of organizing the bankrupt; and thereupon Briggs and Pohl were also elected directors. Clarke was at the time president of Federal Securities Corporation; Briggs and Pohl were respectively vice-president and assistant treasurer of Byllesby & Co., and Shinners a paid employee. On the following day, Bovay was elected president of the bankrupt, Shinners vice-president, Pohl, secretary-treasurer, and O'Reilly, also an employee of Byllesby & Co., assistant secretary-treasurer.

On April 3, 1928, the defendants caused a meeting of the stockholders of the bankrupt to be held to give an appearance of corporate regularity and authority to the acts of the directors. At this meeting, Shinners, the apparent owner of 200 shares, was the sole stockholder present; and he voted and declared that the corporation should purchase the bridge franchise and to pay therefor such consideration

as the officers and directors of the bankrupt should, in their sole discretion, deem advisable; and they also were authorized to dispose of the capital stock and fix the consideration therefor, to borrow money, issue bonds, and to secure them by deed of trust and mortgage on the present and future property of the bankrupt.

According to the minutes of the bankrupt, it appears that a special meeting of the board of directors was held one-half hour later on the same day, at which all of the directors were present, Bovay acting as chairman. Bovay proposed to cause his Arkansas corporation to assign the bridge franchise to the bankrupt, and to cause the defendants to purchase for the sum of $6,299,000, the bankrupt's First Mortgage Bonds in the principal amount of $5,000,000.00. Debentures in the principal amount of $2,000,000.00 (a reduction in amount of $250,000.00) and 39,800 shares of the capital stock (200 shares having apparently been sold to Shinners, or put in his name) in consideration of the payment by the bankrupt to him, Bovay, of the sum of $123,666.00 in cash, $1000.00 monthly from March 1, 1928, until the bridge should be opened for traffic, and the issuance to him of 20,-000 shares of the capital stock. This proposal was unanimously accepted, Bovay himself not voting because of his personal interest. Bovay, in fact, was not present at the meeting and had no knowledge of it.

On April 10, 1928, the defendants, or one of them, deposited to the credit of the bankrupt at a Chicago bank, the sum of $6,347,666.67, which was entered on the bankrupt's books as follows:

| | |
|---|---|
| Proceeds of First Mortgage Bonds at 90 | 4,500,000.00 |
| Proceeds of Debentures at 90 minus | 1,799,000.00 |
| Interest on Bonds and Debentures from | |
|     March 1, 1928 | 47,666.67 |
| Proceeds 200 shares of stock | 1,000.00 |

The bankrupt's books show that the defendants, or one of them, retained the following:

Unamortized Debt Discount & Expense

| | |
|---|---:|
| First Mortgage Bonds | 500,000 |
| 7% Debenture Bonds | 201,000 |

The amount of money deposited to the bankrupt's credit represented the proceeds of the sale of the securities to the defendants plus an accumulation of interest on the bonds and debentures; but prior to the time of the deposit the defendants had already negotiated the sale of the bonds and debentures to others at or above the face value, and ran little or no risk in the venture.

As of April 10, 1928, the cash assets of the bankrupt did not exceed the sum of $6,347,666.67. Its liabilities were in excess of $7,000,000.00 and were never reduced, but thereafter increased.

Neither defendant made any deposit to the bankrupt's credit representing the value of the 39,800 shares of stock, nor was the bankrupt ever paid any consideration therefor. No certificate representing the 200 shares, apparently owned by Shinners was ever issued to him, but, in fact, these shares were transferred to Federal Securities Corporation on April 3, 1928. No certificates were issued for the 39,800 shares until May 30, 1929, and then to the defendants or their nominees.

On April 12, 1928, the bankrupt paid to Byllesby & Co. in reimbursement of the amount paid by it to Bovay either for the surrender of voting control, or as the value of the franchise, the sum of $123,666.00. This franchise was of little pecuniary value, in no event in excess of $23,666.00, the value placed thereon by the Secretary of War under the provisions of the Act of Congress, the amount representing the out of pocket expenses of Bovay in procuring the passage of the Act.

Between April 12 and May 1, 1928, the bankrupt was unlawfully and fraudulently caused to pay to Byllesby & Co. sums of money in excess of $275,000.00, as reimbursements

claimed to be due it for divers expenses claimed to have been paid by Byllesby & Co. on behalf of the bankrupt. Included in this aggregate was the sum of $123,666.00 paid to Bovay for his surrender of voting control of the bankrupt; $18,-348.86 as reimbursement for expenses made in connection with a bridge project at Natchez, Mississippi, and upwards of $23,000.00, ostensibly paid by the bankrupt as salaries to its officials who, at the same time, were paid employees of Byllesby & Co. The checks for these salaries were endorsed over to Byllesby & Co. and the amounts of money converted to its own use.

As a result of these unlawful payments of money to Byllesby & Co., for which the bankrupt received little or no consideration, its cash assets had been reduced, as of May 1, 1928, to $6,109,000.00, and it had no other assets in excess of $50,000.00; and by reason of the enormous profit exacted in the sale of securities, the recited payments of money made to Byllesby & Co. and the issuance to it of 39,800 shares of stock without consideration, the bridge company was rendered insolvent at the very inception of its business life, and financially incapable of completing the bridge in final and permanent form.

The bridge, in an incomplete state, was opened to traffic on May 1, 1928, $5,003,657.00 having been expended for construction work and the purchase of lands. The westerly approach to the bridge on the Louisiana shore, as originally planned, had to be abandoned for want of money, and a temporary wooden structure was substituted under permission of the War Department. The defective and dangerous condition of the temporary wooden trestle, and the imperative need for its immediate replacement, which the bankrupt was financially unable to undertake, was one of the compelling reasons for the later appointment of equity receivers for the bankrupt in 1934.

By the use of capital funds to the extent of $864,456, the bankrupt paid interest on its debentures to March 1, 1932,

and on the bonds to September 1, 1933, and thereby stayed any inquiry by the holders of these securities.

Receivers were appointed for the bridge company by United States District Courts in Mississippi and Louisiana early in 1934. Later petitions in bankruptcy were filed in those courts, and the company was adjudged a bankrupt by the Mississippi court in February, 1934. Susequently the complainants were appointed trustees and the receivers discharged. In August, 1934, the company filed a petition for reorganization under *Section 77B of the Bankruptcy Act.*

Promptly upon their appointment, the receivers sought authority from the court to institute suit against Byllesby & Co. and for authority to employ accountants. A Bondholders Protective Committee, of which Shinners was chairman, intervened and the order for the audit was suspended for some months. The receivers were harassed and delayed in all matters connected with the administration of the estate, and especially in the matter of bringing suits for accounting by litigation fomented and financed by Byllesby & Co. The trustees, upon their appointment, promptly sought authority to institute suit against the defendants, but it was not until June, 1936, that authority was granted to sue in the Mississippi court. The defendants successfully objected to the jurisdiction of the court; and the trustees promptly and repeatedly sought authority to sue in this State. For reasons that are not clear, this authority was not granted until January, 1939; and the bill of complaint was promptly filed.

The bill of complaint charged various breaches of the fiduciary relationship existing between the corporation and its officers and directors who were in entire subservience to the defendants. It was charged that Byllesby & Co. received, out of the assets of the bridge company, a total of $1,176,-765.16, as a result of the alleged breaches of duty. The bill prayed that the defendants be required to account to the complaining trustees; that a decree be entered in their favor and against the defendants jointly and severally in the aggre-

gate sum of $1,176,765.16, with interest; that the defendants be decreed to be liable for the sum of $199,000.00, representing the fixed value of 39,800 shares of capital stock issued to the defendants or their nominees, and not paid for, and to account for any profit on the shares in excess of $5.00 a share.

The defendants demurred to the original bill of complaint for the reasons that no ground was shown for the exercise of equitable jurisdiction, that there was an adequate remedy at law, and that the complainants were in laches. The demurrer was sustained on the last ground. 25 *Del. Ch.* 1, 12 *A.* 2d 178. An amended bill was filed, and demurred to on the same grounds. The Chancellor held that there was no adequate remedy at law available to the complainants, and that the imputation of laches had been excused by the additional averments of the amended bill. 26 *Del.Ch.* 69, 22 *A.2d* 138. The defendants, without answering, pleaded the statute of limitations of three years applicable to certain personal actions. 5129, *Rev. Code* 1935.

The Chancellor refused the complainants' motion to strike the plea and entered a decree dismissing the bill, on the ground that the defendants were not the trustees of an express trust, and the cause of action not being within the exclusive jurisdiction of a court of equity, he was bound to apply the analogous statutory period of limitation governing actions at law, (*ante p* 33, 29 *A.* 2d 801), citing, *inter alia*, in support of his conclusion, *Perkins v. Cartmell's Adm'r*, 4 *Har.* 270, 42 *Am.Dec.* 753; *Hayden v. Thompson*, (8 Cir.) 71 *F.* 60; *Boyd v. Mutual Fire Association*, 116 *Wis.* 155, 90 *N. W.* 1086, 94 *N.W.* 171, 61 *L. R. A.* 918, 96 *Am. St. Rep.* 948; *Cooper v. Hill*, (8 Cir.) 94 *F.* 582; *Jones Mining Co. v. Cardiff Mining & Milling Co.*, 56 *Utah* 449, 191 *P.* 426; *Landis v. Saxton*, 105 *Mo.* 486, 16 *S.W.* 912; *Lexington & O. R. Co. v. Bridges*, (*Ky.*) 7 *B.Mon.* 556, 46 *Am.Dec.* 528.

In the absence of an answer the averments of the bill of complaint are to be accepted as true; and upon a careful con-

sideration of the facts and the applicable law we are satisfied that the dismissal of the bill of complaint was not justified.

The defendants were in the position of fiduciaries, and, as such, under duty to exercise the utmost good faith in their transactions with the bankrupt. *Lofland, et al., v. Cahall,* 13 *Del.Ch.* 384 118 *A.1.* They are charged with having acted in bad faith, and there is no denial of the charges as the cause now stands. There is also the question whether the transactions were valid in law for the reason that votes of interested directors are not to be counted in making up a majority of the board of directors. *Keenan v. Eshelman,* 23 *Del. Ch.* 234; 2 *A.* 2d 904, 120 *A. L. R.* 227. Trustees in bankruptcy have the rights of a creditor armed with process. An insolvent corporation is civilly dead in the sense that its property may be administered in equity as a trust fund for the benefit of creditors. *Graham v. La Crosse & M. R. Co.,* 102 *U.S.* 148, 26 *L. Ed.* 106; *Amussen v. Quaker City Corporation,* 18 *Del. Ch.* 28, 30, 156 *A.* 180. The fact which creates the trust is the insolvency, and when that fact is established, the trust arises, and the legality of the acts thereafter performed will be decided by very different principles than in the case of solvency. *McDonald v. Williams,* 174 *U.S.* 397, 19 *S. Ct.* 743, 43 *L. Ed.* 1022. The execution of a trust and the following and administering of trust funds are immemorial heads of equity jurisprudence. *Cahall v. Burbage,* 13 *Del. Ch.* 299, 119 *A.* 574; *Ratcliff v. Clendenin,* (8 *Cir.*) 232 *F.* 61.

The courts, state and federal, at different times, and under varying circumstances, have held officers and directors of corporations to be at one time agents or mandatories, and at another time, trustees, and have defined their liability accordingly; and they have been held as trustees where they took such advantage of their position of trust as public policy could not tolerate. See 3 *Fletcher, Cyc. Corp. (Perm. ed.)* 149.

In *Lofland, et al., v. Cahall, supra,* the receiver of a dis-

solved corporation sued in equity to recover from former officers and directors, all of whom were participants in the unlawful acts charged, moneys which they wrongfully took from the corporation as salaries and the value of the stock which they had issued to themselves for alleged services rendered, together with the dividends paid thereon. In these circumstances, we said that directors of a corporation were trustees for the stockholders, and their acts were governed by rules applicable to such a relation, which exact of them the utmost good faith and fair dealing, especially where their individual interests were concerned.

In *Keenan v. Eshelman, supra,* minority stockholders, in their derivative right, sued the officers and directors of the corporation to compel them to account for and pay over money paid as managing fees to a certain management corporation of which the directors were also officers, and by whom it was controlled; and in these circumstances we repeated that directors of a corporation were trustees for the stockholders.

The language of the court is to be interpreted in the light of the situations presented. Clearly, it was not meant that directors of a corporation are trustees, in a strict and technical sense, in all of their relations with the corporation, its stockholders and creditors; but, as clearly, it was implied that they should be treated as such when they have unlawfully profited through breach of duty, and at the expense of the corporation.

In *Guth v. Loft, Inc.,* 23 *Del. Ch.* 255, 5, *A.* 2d 503, 510, we said, more exactly, that corporate officers and directors while technically not trustees, stand in a fiduciary relation to the corporation and its stockholders which admits of no conflict between duty and self interest, and we continued:

"The rule, inveterate and uncompromising in its rigidity, does not rest upon the narrow ground of injury or damage to the corporation resulting from a betrayal of confidence, but upon a broader foundation of a wise public policy that, for the purpose of removing all

temptation, extinguishes all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation. Given the relation between the parties, a certain result follows; and a constructive trust is the remedial device through which precedence of self is compelled to give way to the stern demands of loyalty."

The defendants, or Byllesby & Co. at least, were in complete control of the bankrupt. As regards corporate action, Byllesby & Co. was the bridge company. What it proposed as the bridge company, it accepted as Byllesby & Co. Bovay was a participant in the alleged unlawful acts. The bankrupt had no officer or director with an uncontrolled and unbiased mind. Byllesby & Co. acquired without consideration two-thirds of the bankrupt's capital stock, and, consequently, two-thirds interest in a presumptively profitable enterprise, and that too with but a small money investment in the bankrupt's securities. The defendants exacted from the bankrupt a tremendous toll for the marketing of its securities. It was required to pay to Bovay $100,000.00 for the defendant's benefit and advantage; it was compelled to reimburse them for any and all sums of money claimed by them to have been expended in promoting the project and investigating its possibilities; and the salaries paid to the bankrupt's officers and employees were converted to the defendant's use. The bankrupt was rendered insolvent at the beginning of its corporate life, and financially unable to complete the undertaking for which it was organized.

The suit, then, is one brought for the benefit of creditors to recover large sums of money unlawfully and fraudulently diverted from a trust fund and converted to the use of the defendants in violation of the fiduciary relationship. It is a suit to execute a trust, and to undo a fraud. The validity in law of the several transactions is questioned. Want of good faith and fair dealing is asserted. An accounting is prayed; and a proper accounting and the correct inferences to be drawn from the facts developed are matters only for a court of equity in which a careful, patient and extended examination of all of the evidence can be made and a just conclusion

reached by a trained mind in accordance with established equitable principles. *Hayden v. Thompson, supra.*

But it is argued that the application of the statute of limitations is determined by the cause of action, rather than by the nature of the equitable relief sought; the fact that the legal remedy is inadequate to obtain the relief which a court of equity could afford does not take the case out of the bar prescribed for the legal action for the same cause; that the only trusts against which the statute of limitations does not run are those technical and continuing trusts which are not cognizable at law, but fall within the proper, peculiar and exclusive jurisdiction of courts of chancery; and, therefore, it follows that trusts which are grounds for actions at law are subject to the operation of the statute.

Such is the rule as it is generally stated. Here the causes of action are based on fraud and unfair dealing. The trust is one arising by operation of law, and not one expressly created by acts of parties. Regarded as a ground or cause of action, the trust is theoretically within the concurrent jurisdiction of the law and equity courts.

But it does not follow that, in all suits in equity against wrong doing corporate officers and directors to enforce constructive trusts, the statute of limitations is available as a defense. A review of the authorities, and some of them are cited and apparently relied on by the court below in support of its decree, leads to the conclusion that where a court of equity exercises a concurrent jurisdiction in respect of constructive trusts arising out of derelictions of duty on the part of the corporate officers and directors, the application of the statute of limitations will depend upon the circumstances of the particular case.

In 3 *Fletcher, supra,* 798, the author says with respect to suits against corporate officers and directors, that if the action is maintainable either at law or in equity, and suit is brought in equity, the court will follow the statute of limitations, unless unusual or extraordinary circumstances render

its application inequitable in a particular case. In 3 *Scott on Trusts,* 2355, it is said that the constructive *cestui que trust* will ordinarily be barred after the lapse of time fixed by the statute for actions at law in analogous cases, but much depends upon the circumstances on which the constructive trust is based. In *Hanbury, Modern Equity,* 76, the language of the writer is that in case of legal claims, or equitable claims closely analogous to legal claims, equity will, as a rule, apply the period prescribed by the statute of limitations. In 34 *Am.Jur.* 88, this is said: "However, in spite of the many authorities which, in general terms, assert the rule that the statute of limitations runs against all implied, resulting, or constructive trusts, a doubt has been voiced as to the literal correctness of the rule"; and on pages 55, 56, of the same volume, the general rule is stated that courts of equity, in cases of concurrent jurisdiction, consider themselves bound by the statute of limitations which govern courts of law in like cases, but where the relationship is that of trustee and *cestui que trust,* the statute of limitations will not necessarily apply, although the remedies at law and in equity are concurrent; and equity will refuse to adopt a rule of limitations where injustice would result. In 15 *A. & E. Ency. Law* (2d ed.) 1205, 1206, it is said the rule that where it is sought to enforce a resulting or constructive trust courts of equity, as a rule, act in analogy to the period of limitations relating to actions at law, is not absolute and inflexible; and where the constructive trust arises out of fraud of the alleged trustee, the question as to what time will constitute a bar is peculiarly within the equitable discretion of the court, to be decided in each case according to its nature and circumstances.

An examination of the decisions confirms the accuracy of these observations.

In *Briggs v. Spaulding,* 141 *U.S.* 132, 11 *S.Ct.* 924, 929, 35 *L.Ed.* 662, after remarking that directors were often styled trustees, but not in any technical sense, the court con-

tinued, "but, undoubtedly, under circumstances, they may be treated as occupying the position of trustees to *cestui que trust.*"

In *Agens v. Agens*, 50 *N.J. Eq.* 566, 25 *A.* 707, the Vice-Chancellor said that very special circumstances would serve to except a case from the operation of the rule that where there is both a legal and equitable remedy for the same cause of action, the equitable remedy will be barred if the legal remedy has been barred by lapse of time.

In *Cooper v. Hill, supra,* the receiver of an insolvent bank sued in equity the officers and directors to recover certain funds alleged to have been misappropriated by them. The bank owned an abandoned mining property and certain money was expended in putting it in condition for sale. This expenditure was held to be within the reasonable discretion of the bank's officers; but they went further and spent a large sum in prospecting for pay ore on the property, an act in excess of the powers of a national bank. When the money was diverted, the bank was solvent and prosperous. There was no concealment of the transaction and the defendants profited nothing. The defendants pleaded successfully the statute of limitations, the court saying this [94 *F.* 590] :

"Ordinarily laches runs *pari passu* with the statute of limitations. If the latter has barred the analogous action at law, laches has stayed the corresponding suit in equity. But if unusual conditions or extraordinary circumstances make it inequitable to allow the prosecution of a suit after a briefer, or to forbid its maintenance after a longer period than that fixed by the statute, the Chancellor will not be bound by the statute, but will determine the extraordinary case in accordance with the equities which condition it," citing *Kelley v. Boettcher*, (10 *Cir.*) 85 *F.* 55, and continued, "If the acts of the appellants upon which this suit is founded had been parts of a continuous and persistent cause of action which had wrecked this bank and robbed its creditors and stockholders, if they had been accompanied with intentional misrepresentations, if they had been purposely or negligently concealed from the other officers and employees of the bank or from its stockholders and creditors, these facts might well induce a court of equity to permit this suit to be maintained notwithstanding the statute."

In *Lexington & O. R. R. Co. v. Bridges, supra,* Bridges, a creditor, sued a number of individuals in equity alleging that some of them were indebted to the company on account of the reception of illegal dividends, others on account of stock subscribed, and that others had acted as directors and managers of the company, and by declaring dividends when no profits existed, had rendered themselves individually liable to the creditors of the company. The defenses of the directors were that there were net profits to divide, and the declaration of dividends was legal; that they acted in good faith, misled by an officer charged with the duty of keeping accounts; and the statute of limitations. Nothing fraudulent was shown; and the court observed that if the directors had been guilty of negligence to any extent, it was not such gross negligence as subjected them to the imputations of legal fraud. It was held that the trust was not a direct, express and continuing trust of a purely equitable nature, to which the statute of limitations was not a bar. Said the court, "But where the trust is not strictly of this character, where it is limited in its duration, or where the party seeking redress has a legal remedy, and a court of law has concurrent jurisdiction with a court of equity, the rule does not apply; but the statute is permitted to have its operation whether the suit is brought at law or in chancery," adding later this qualification, "The statute of limitations is founded upon the soundest principles and the wisest policy. It should be permitted to have its effect in all cases, where its operation would not work evident injustice."

In *Curtis, Receiver, v. Connly,* 257 *U.S.* 260, 42 *S. Ct.* 100, 101, 66 *L. Ed.* 222, suit was brought in equity by a receiver of a national bank to recover from former directors for losses sustained because of dividends paid out of capital and improper loans and investments made by the defendants. The defense was the statute of limitations. The bank was solvent when the defendant directors left the board. There was no suggestion that the defendants had enriched

themselves. In these circumstances, the court, speaking through Justice Holmes, said,

"The statute of limitations must not be applied so narrowly that business men will be afraid to take directorships, and however this bill be read in its details it appears to us not to charge enough to deprive the appellees of the protection of the act. It is said that they stood in a fiduciary relation to the bank. But they were strangers to it when they left the board, more than six years before this suit was brought. We see no reason why the statute should not apply."

In *Payne v. Ostrus*, (8 Cir.) 50 *F.* 2d 1039, 1042, 77 *A.L.R.* 531, the receiver of a national bank sued in equity, for the benefit of creditors, the directors for losses resulting from the making or approving excessive loans, and for negligence in failing to enforce the claimed liability of former directors. The defendants did not profit. It was said that since directors of a national bank are not trustees of an express trust, but of an implied and resulting trust created by operation of law, statutes of limitation apply and may be invoked by them; but the court continued, "Of course, where fraud, concealment, or unusual conditions or extraordinary circumstances exist, the chancellor, in a suit of this nature, will not be bound by the statute, but 'will determine the extraordinary case in accordance with the equities which condition it'." *Citing Cooper v. Hill, supra.* And the court went on to say that neither fraud, concealment, nor other unusual conditions or extraordinary circumstances attending the operations of the bank were charged or shown.

In *Anderson v. Gailey*, (D. C.) 33 *F.* 2d 589, 592, the receiver of a national bank sued in equity as for an accounting certain of the directors seeking recovery in behalf of the bank its stockholders and creditors under the common law and the statute for acts and negligences resulting in loss to the bank. The statute of limitations was pleaded. The court said that the causes of action were really torts and equity will not enforce them if barred at law.

"Directors," said the court, "as respects their corporation and its stockholders are not technical trustees in whose favor limitation does not run at all during the continuance of their trust. Their relationship is fiduciary, and trust doctrines are sometimes applied to effectuate equities as respects rights in property; but as respects liability for misconduct and limitation of action therefor they are more exactly agents or mandatories. * * * It cannot be said generally that a director has no protection by the statute of limitations so long as he continues in office."

The opinion concluded, however, with this significant statement:

"I conclude that the alleged acts of making excess loans or loans insolvent when made more than four years before suit was brought are barred. * * * No fraud or fraudulent concealment appears in these, and failure to use diligence to discover and enforce liability does appear. To be excepted from this ruling are those cases, if any, in which certain directors are alleged to have been beneficially interested in the loans. These, being dealings with their corporation to their own advantage, ought to be more closely looked into, and are retained for trial * * *."

In *Hayden v. Thompson, supra,* the receiver of an insolvent bank sued in equity all of the shareholders to recover dividends unlawfully paid out of capital and when it was insolvent. Some of the defendants demurred to the bill on the ground that there was an adequate remedy at law. One defendant, Hall, demurred on the ground that the cause of action against him was barred by the statute of limitations. It was held that the court had jurisdiction of the cause for the reason that the suit in effect, was a suit to execute a trust, to undo a fraud, and to prevent a multiplicity of suits. What the court said with respect to implied trusts being within the operation of the statute of limitations was in the case of the defendant, Hall, who was not a director, and who took in good faith an unearned dividend without the knowledge of any fact which would lead a reasonably prudent man to learn that the dividend was not earned.

In *Winston, et al., v. Gordon, et al.,* 115 *Va.* 899, 80 *S.E.* 756, the trustees of an insolvent bank sued in equity

the directors to recover loss and damage resulting from misconduct and neglect in the administration of the bank's affairs. It was charged that loans had been improvidently made to insolvent persons, and certain others had been allowed to overdraw their accounts. No fraud or concealment was averred, and there was no allegation that the defendants had profited personally. It was in these circumstances that the statute of limitations was held to be a bar.

In *Backus-Brooks Co. v. Northern Pacific R. Co.* (8 *Cir.*) 21 *F*. 2d 4, 12, the complainant, a minority stockholder of a railway company which was dominated by the defendant company, sued on behalf of the railway company for loss and damage sustained by reason of the defendant's operation of the complainant's railway for the defendant's own benefit. It was held that the interest which the complainant sought to enforce was equitable, and that its sole remedy was in equity. The court proceeded to say that the right of a stockholder to maintain a suit in equity in behalf of the corporation after the running of the statute of limitations should be limited to extraordinary cases where there are unusually strong equities in favor of the complainant. It was further held that the complainant had wholly failed to excuse the delay in bringing suit, and quoted from the opinion of Judge Sanborn in *Kelley v. Boettcher, supra*:

"When a suit is brought within the time fixed by the analogous statute, the burden is on the defendant to show, either from the face of the bill or by his answer, that extraordinary circumstances exist which require the application of the doctrine of laches; and, when such a suit is brought after the statutory time has elapsed, the burden is on the complainant to show, by suitable averments in his bill, that it would be inequitable to apply it to his case."

In *Lippitt v. Ashley*, 89 *Conn.* 451, 94 *A*. 995, 1003, the receivers of a savings bank sued directors of the bank to recover damages for alleged negligence in permitting the bank's assets to be stolen by its treasurer, and to recover, under statute, the amounts of certain dividends declared

and paid in excess of profits. The statute of limitations was held to be a bar. The directors were representative men of the community and of excellent character. There was no charge of personal profit accruing to them. The court was divided in its opinion as to whether the defendants were guilty of any negligence at all. The majority opinion contains pregnant observations. Said the court,

"Bank directors are not technical trustees any more than are the directors of other corporations, yet nobody doubts that corporate directors, including bank directors, may, under certain circumstances, make themselves liable for corporate assets as if they were trustees. But the question which we have to answer is a much narrower one, namely, whether these defendants ought to be treated as if they were trustees of a direct or express trust, or whether they ought to be treated as if they were trustees of an implied trust. In the former case the statute will not run, and in the latter it will. * * * We prefer to rest our decision on the broader ground that the defendants are not guilty of anything more than passive neglect of the duty of exercising reasonable care in the supervision of the treasurer, without actual or constructive notice of any wrongdoing on the treasurer's part. Their offense is not so heinous as to require that they should be deprived, by a court of equity, of their statutory defense. Both reason and authority indicate that the exercise of such an extreme judicial power may well be reserved for a different case."

The following three cases cited by the Chancellor in his opinion may be said to support his decision, but they are not, in our opinion, convincing.

In *Landis v. Saxton, supra,* the plaintiff, the sole surviving director of a dissolved corporation sued as statutory trustee to recover from a former secretary and treasurer a sum of money alleged to have been embezzled. The statute of limitations was pleaded, and was held to be a bar as the trust was not an express trust. It did not appear, however, that the corporation was insolvent or that the rights of creditors were in any way involved.

In *Jones Mining Co. v. Cardiff Mining & Milling Co., et al., supra,* the complaining corporation sought to have the defendants declared trustees for its benefit as to a min-

ing claim, on the ground that the defendants had relocated the claim pursuant to a collusive agreement between a director of the complaining corporation and the relocators. The statute of limitations was invoked by demurrer to the bill and it was held that the suit was barred by the statute as the director was not a trustee of an express trust. It appeared that the stockholders of the complainant allowed the corporation to become dormant for fifteen years, and then revived it for the purpose of winding up its affairs. It did not appear that the corporation was insolvent. There was no concealment of the relocation, it being a matter of public record. The majority of the court, consisting of five members, characterized the transaction as a plain case of one person having a possessory right to government mineral lands from which he is dispossessed by another, and where the acts resulting in the dispossession were done openly and were hostile to the rights of the possessor from their inception. Two of the Justices, strongly dissenting, were of opinion that the director occupied a fiduciary relation with the complainant, and that the other defendants conspired with him to defraud the complainant and took the property burdened with the same trust in favor of the plaintiff as had existed between the director and the complainant; that on the face of the bill the action was not barred by the statute or by laches, and that the Chancellor should hear the testimony and decide the case on its merits.

In *Boyd, et al., v. Mutual Fire Association, et al., supra,* creditors of an insolvent mutual fire association sued, *inter alia,* its officers and directors to recover for losses sustained through their fraudulent administration of its affairs and for appropriations of its money to their use. The statute of limitations was invoked. It was held, citing 3 *Thompson, Corporations,* § 4128, that the officers and directors in equity were trustees of an express trust for the benefit of shareholders and creditors and were within the principle that the statute of limitations does not run in favor of such

trustees as against the *cestui que trust*. There was no dissent. On rehearing, however, there was a complete change of position by all of the members of the court except the Chief Justice who wrote the first opinion. It was held that officers and directors of a corporation were not trustees of an express trust. As to the question whether the relation of the officers and directors was such that, under the circumstances of the complaint, they could avail themselves of the statute, it was said that there was a divergence of opinion in the authorities. *Williams v. McKay*, 40 *N. J. Eq.* 189, 53 *Am. Rep.* 775, and *Ellis v. Ward*, 137 *Ill.* 509, 25 *N.E.* 530, were cited as representing a type of case holding that the managers of a bank stood in the relation of trustees to the depositors so that the statute of limitations would not be a bar against a charge of mismanagement.

"It is perfectly evident," said the opinion [116 *Wis.* 155, 94 *N. W.* 172, 61 *L. R. A.* 918, 96 *Am. St. Rep.* 948], "that this court cannot follow this decision (*Williams v. McKay*) without overruling a large line of cases repudiating the trust-fund doctrine. Neither the corporation nor its governing body, so long as it is a going concern, holds its property in trust for creditors. The officers or directors occupy a fiduciary relation. * * * If they violate their duty, they at once become responsible to the corporation. If they are guilty of misfeasance or malfeasance, the latter may at once bring an action at law to enforce such liability. If the corporation refuses to act, the stockholders before insolvency, and the creditors after insolvency, may enforce such liability in the right of the corporation, and not otherwise. * * * The fact that the creditor must sue in equity does not alter the situation."

The opinion then went on to say that the court was fully impressed with the weight of the reasons supporting the contrary view, pointing out the peril to the public in becoming stockholders or creditors in view of the ample opportunity enjoyed by corporate officers to cover their malfeasances. On the other hand, it was said that without limitation of action officers might be held for mere negligence at remote periods. The Chief Justice dissented, saying that officers and directors of a corporation have the actual care and custody of the corporation's property, and

are chargeable in equity with an active duty in respect to it, not only for the benefit of the corporation, but also for the benefit of the *cestui que trust.* Said he:

"When, therefore, such officers and directors, in violation of such duty, convert a large portion of the property of the corporation to their own private use, and there is no publicity of the fraud, they necessarily become chargeable in equity, as trustees of the property so fraudulently converted, for the benefit of the cestui que trust. As to the property so converted, they hold the same as a continuing and subsisting trust, assumed and acted upon by themselves in violation of duty to the cestui que trust."

The change of decision seems to have been rested largely on the ground that the trust fund doctrine had been repudiated in Wisconsin in a long line of cases. In another aspect the opinion of the majority of the court is not persuasive. The suit was not an attempt to hold corporate officers and directors liable for mere negligence at some remote period, but to recover from persons in a fiduciary capacity assets fraudulently converted to their own use.

The decision of the former Court of Errors and Appeals in *Perkins v. Cartmell's Adm'r, supra,* is not in conflict with the conclusion we reach. There, a testator had bequeathed to his married daughter, Margaret Cartmell, a legacy to be paid in three years after his death out of real estate devised to his son. The daughter lived upwards of thirty years after the legacy had become due without having made demand for payment. Upon her death, her administrator sued in equity to enforce payment of the legacy against the devisee of the lands on the theory that an express trust had been created. The Chancellor held that the suit was not barred by the statute of limitations as the trust was one cognizable solely in equity. The appellate court seems to have regarded the cause as one within the concurrent jurisdiction of the court, and within the general rule that where the statute bars the legal remedy, it shall bar the equitable remedy in an analogous case, and held the suit barred both by the statute and by laches. As the court

viewed the trust, the decision was correct. The parties lived in the same neighborhood. There was, of course, no fraud or concealment. One of the defenses was that the legacy had in fact, been paid. No unusual circumstances existed to take the case out of the operation of the general rule.

The appellants. rely in large measure on the following decisions:

In *Ellis v. Ward, supra*, the receiver of an insolvent life insurance company sued the directors in equity to recover money of the company paid out for their own personal account and benefit. The statute of limitations was pleaded. It was held that the assets of a corporation, in equity, are a trust fund and the directors trustees; that the directors had no power or right to use or appropriate the funds of the corporation, their *cestui que trust*, for their own benefit; and that no lapse of time was a bar to a direct or express trust as between the trustee and *cestui que trust*.

"Ordinarily," said the court, "an express trust is created by deed or will; but there are many fiduciary relations established by law, and regulated by settled legal rules and principles, where all the elements of an express trust exists, and to which the same legal principles are applicable; and such appears to be the relation established by law between directors and the corporation [137 *Ill.* 509, 25 *N. E.* 533]."

The appellees insist that the language quoted is in conflict with authority generally; and that in a much later case (*Anchor Realty & Investment Co. v. Rafferty,* 308 *Ill. App.* 484, 32 *N.E.* 2d 394) it was held that a director is not a trustee in a technical or ultimate or universal sense. But the court went on to say, however, that a director or officer of a corporation may be a trustee for the stockholders. *Becker v. Billings, et al.,* 304 *Ill.* 190, 136 *N.E.* 581, refers directly to the case of *Ellis v. Ward.* There a stockholder of an insolvent bank sued in equity the directors to recover large sums of money lost to the bank through the negligence of the directors in failing to attend meetings and to super-

vise, examine and inspect the business transactions of the bank, whereby one director was allowed to dominate its affairs and to invest the bank's funds in his speculative enterprises. The charge was negligence only. The statute of limitations was invoked. The bill was dismissed for want of equity, and the decree affirmed on appeal. The appellant contended, on the authority of *Ellis v. Ward,* that the directors were trustees of an express trust in whose favor the statute did not run. The court remarked that *Ellis v. Ward* was the only case in Illinois holding directors to be trustees of an express trust, and cited a long list of decisions in other jurisdictions to the contrary. *Ellis v. Ward* was explained, however, by pointing out that in that case the defendants were directors who had misappropriated the money, and were still directors when the bill was filed against them. The authority of the decision, upon its particular facts, seems not to have been disturbed.

In *United Light & Power Co. v. Grand Rapids Trust Co.,* (6 *Cir.,*) 85 *F.* 2d 331, the receiver of an insolvent railway company sued United Light & Power Company, practically the sole stockholder of the insolvent railway company, to recover large sums of money paid to the appellant in stock dividends out of capital, for management, contracting and engineering fees, and money paid out as interest at usurious rates, all of which was claimed to have been exacted by the appellant from the railway by reason of control exercised over it through stock ownership. The statute of limitations was pleaded which, if applicable, would have barred a substantial portion of the claim. The Circuit Court of Appeals for the Sixth Circuit held that an equity court was not bound by the statute, saying that the suit was essentially in equity for the recovery of a trust fund for the benefit of creditors; that a court of law did not have concurrent jurisdiction; and no reason was found for applying the analogous equitable principle of laches. *Certiorari* was denied. 299 *U.S.* 591, 57 *S. Ct.* 118, 81 *L. Ed.* 436.

The decision in *Williams v. McKay*, 40 *N. J. Eq.* 189, 53 *Am. Rep.* 775, goes farther than we are required to go here. There, the receiver of an insolvent savings bank sued in equity the managers for losses through a series of years resulting from the investment of money on insufficient landed security and in violation of the charter; loaning money on personal security; and in allowing the president to withdraw and apply to his own use the funds of the bank. The statute of limitations was pleaded.

It was held that the receiver not only represented the corporate body, but also the depositors and creditors; that the relation between the depositor and managers embraced all of the materials out of which trusts are created; and that the right of the depositor to look to the managers for reparation when a loss had been occasioned by their default, was an equitable right, cognizable only in a court of conscience. Lapse of time, said the court, was not an absolute bar to an equity of such nature.

In *Payne v. Bullard*, 23 *Miss.* 88, 55 *Am. Dec.* 74, a suit in equity was brought to recover unpaid stock subscriptions of an insolvent corporation to satisfy the demands of a creditor whose judgment had been returned unsatisfied. There seems to have been a remedy by the process of garnishment. The court held that it was a case of a continuous trust and confidence to which the statute of limitations had no application, the stock subscribed being in the nature of a trust fund for the payment of liabilities.

*Hightower v. Thornton*, 8 *Ga.* 486, 52 *Am. Dec.* 412, was a like case.

The English courts take a strict view of the fiduciary relationship of corporate directors. In *Flitcroft's Case*, 21 *Ch. Div.* 519 (*Re Exchange Banking Co.*) the official liquidator of an insolvent joint stock company sued the directors to recover money improperly paid out of capital as dividends. The acts of the directors were held to be breaches of trusts to which the statute of limitations had no applica-

tion. Britt, L. J., observed that "no Statute of Limitations nor any bar by analogy to the statute can be relied on"; and Cotton, L. J., said "The Statute of Limitations can in no way apply to a case like the present, for the ground of our decision against the directors is that they have misapplied funds as to which they stood in the position of trustees."

In the matter of *Masonic and General Life Assurance Co. v. Sharpe*, 1 *Chan.* 154 (1892) the liquidator of an insolvent life insurance company sued the executors and residuary legatees of two deceased directors to recover assets of the company paid away out of capital as interest on shares while they were directors. The main ground relied upon by the defendants was lapse of time. North, J., held that the demand was neither stale nor was it barred by the statute. Lindley, L. J., said:

"Now a director of a company is certainly not a mere agent. It is his duty, amongst other things, to protect the company and to enforce its rights even against himself, and the conflict between his interest and his duty when he has misapplied the company's money prevents the Statute of Limitations from applying to an action brought against him by the company in order to recover such money."

Bowen, L. J., was of the same opinion.

Sound public policy requires the acts of corporate officers and directors in dealing with the corporation to be viewed with a reasonable strictness. Where suit is brought in equity to compel them to account for loss or damage resulting to the corporation through passive neglect of duty, without more, the argument that they ought not to be deprived of the benefit of the statute of limitations is not without weight; but where they are required to answer for wrongful acts of commission by which they have enriched themselves to the injury of the corporation, a court of conscience will not regard such acts as mere torts, but as serious breaches of trust, and will point the moral and make clear the principle that corporate officers and directors, while

not in strictness trustees, will, in such case, be treated as though they were in fact trustees of an express and subsisting trust, and without the protection of the statute of limitations, especially where insolvency of the corporation is the result of their wrongdoing.

It follows that the bare plea of the statute of limitations without more, was wholly insufficient in law as a defense to the charges of the complaint. The plea should have been dismissed pursuant to the complainants' motion, and the defendants required to defend on the merits. The averments of the bill may be disproved. The defendants may be able to show that their conduct was not such as to deprive them of the protection of the statute. Accordingly, by proper pleadings, they may set up the bar of the statute in connection with such explanatory or exculpatory facts and circumstances as will serve to except them from the reach of the principles here stated.

The decree is reversed, and the cause is remanded to the court below with the direction that the bill of complaint be reinstated, and the plea of the statute of limitations, as pleaded, dismissed, the defendants to answer or plead anew.

June 16, 1944. Petition for rehearing denied.